**STATE of Tennessee, Appellee,**

v.

**Omar SANTIAGO, Appellant.**

Court of Criminal Appeals of Tennessee,
at Knoxville.

July 31, 1995.

Permission to Appeal Denied
Jan. 2, 1996.

John Herbison, Nashville, on appeal for Appellant.

Terry Stewart and Heiskell Winstead, Rogersville, at trial for Appellant.

Charles W. Burson, Attorney General and Reporter, Hunt S. Brown, Assistant Attorney General, Nashville, Carl Kirkpatrick, District Attorney General (Pro Tem), Paul Laymon, Asst. District Attorney, Phyllis Miller, Asst. District Attorney, Blountville, for Appellee.

## OPINION

BARKER, Judge.

The appellant, Omar Santiago, was convicted of conspiracy to sell or deliver over seventy (70) pounds of marijuana, a class B felony, and was sentenced to twelve years in the Department of Correction as a Range I standard offender. On appeal, he challenges the sufficiency of the evidence and the length of his sentence. We affirm the judgment of the trial court.

The one count indictment charged the appellant with conspiring to sell or deliver marijuana with William Poe and Ed and Gloria Muncey. The state's evidence at trial revealed that James Goodnight, Robert and Ann Guy, and Robert Davis were also involved in the conspiracy. In sum, the appellant, a resident of Waco, Texas, supplied marijuana, and arranged for it to be delivered to Hawkins County, Tennessee.[1] Robert and Ann Guy picked up the marijuana in Waco, usually at the home of Goodnight, and drove it to the Muncey's home in Bulls Gap, Tennessee. Ed Muncey, Richard Davis, and William Poe weighed and packaged the marijuana.

Robert Guy testified that he met the appellant in Waco, Texas, in 1985. The appellant first asked Guy to deliver marijuana in October or November of 1991:

[The appellant] approached me with the proposition of delivering some marijuana for him, and Mr. Poe was there at the time. We were in my house. He [the appellant] said he would pay me good.... We finally said, 'yeah, sure, we will take some up there for him.'

The appellant promised to pay Guy twenty-five dollars a pound for each delivery, plus traveling expenses. According to Robert Guy, the appellant supplied the marijuana in Texas, and William Poe managed its distribution in Tennessee. Robert and Ann Guy subsequently made seven trips to Bulls Gap, Tennessee, each time delivering between thirty-eight (38) and fifty (50) pounds of marijuana. Robert Guy testified that he was paid $750 for each of the first three trips, and $1,000 for trips four, five and six; however, he said that it was often difficult to collect the money.

The first trip occurred around December 21, 1991.[2] The marijuana was placed into two suitcases and a box in Ann Guy's 1978 Mercury Marquis. The Guys, accompanied by Poe, drove the marijuana to Ed Muncey's home in Bulls Gap, Tennessee. Robert and Ann Guy returned to Texas, but Poe stayed at the Muncey's. A second trip was made around February 6, 1992; the Guys and William Poe again traveled in one car, and delivered marijuana to the Muncey's home in Tennessee. Richard Davis was also present at the Muncey's. The Guys spent the night

1. The venue for the trial was changed to Hamblen County due to extensive publicity.

2. This trip was documented by the Guys' credit card receipts for gasoline. The receipts were dated December 21–23, 1991.

at a motel in Rogersville, Tennessee,[3] and returned to Waco the next day. William Poe gave the Guys expense money, and stayed at the Muncey's. The third trip occurred around March 7, 1992, this time with the Guys travelling alone.[4] They dropped off the marijuana at the Muncey's, where Ed and Gloria Muncey were present along with Richard Davis and Poe.

Deliveries of marijuana were again made in late March, early April, and early May of 1992.[5] The appellant supplied the marijuana for each trip, and the Guys picked it up at James Goodnight's home in Waco, Texas. The Guys drove it to the Muncey's home in Tennessee where it was weighed and packaged by Muncey, Poe and Davis. On one trip, while at the Muncey's, Robert Guy saw Richard Davis give Poe $3500. Poe, in turn, gave the money to Guy and instructed him to deliver it to the appellant when he returned to Waco. On another trip, the April 5th delivery, the Guys drove marijuana to Tennessee in a Ford Thunderbird owned by Goodnight. The car was specially equipped to conceal the marijuana in hollow compartments in the seats, arm rests and fender wells. After each return trip to Waco, Guy would meet with the appellant.

Before the seventh and final trip in late May of 1992, the appellant called the Guys in Waco. Ann Guy recognized the appellant's voice, and gave the phone to her husband. The appellant wanted a delivery to be made in the middle of the week, whereas all previous trips had been made on weekends. The Guys went to Goodnight's house to get marijuana per the appellant's instructions. According to Robert Guy, the appellant was present at Goodnight's; and a green duffle bag and a brown suitcase, both full of marijuana, were placed in the back seat of the Guys' Mercury Marquis. On this trip, William Poe opted to lead the way to Tennessee in a separate car, his white Ford LTD. Poe

gave the Guys a portable CB for their car, and had one in his car as well. According to Robert Guy, Poe was to look out for police and communicate with the Guys via the CB radios.

On the morning of May 27, 1992, William Poe was stopped for speeding near Memphis by Officer Mark Kellerhall of the Shelby County Sheriff's Department. Kellerhall noticed the odor of burned marijuana in Poe's car, and Poe was "nervous and evasive" when asked who owned the car. Kellerhall asked Poe to wait in the patrol car while he checked the registration, and then noticed a brown car on the highway "driving slow and hampering traffic." Kellerhall radioed to have someone investigate the second car, and then proceeded to search Poe's vehicle. He found a CB radio tuned to channel 32, the residue of marijuana, miscellaneous papers and receipts, phone bills, small luggage keys, and a key to a master lock. Kellerhall also noticed that Poe had two different Tennessee license plates, one on the rear bumper and one on the rear dashboard. Poe was taken into custody.

Officer Lanny Hughes responded to Kellerhall's call and stopped the Guys' car as a possible DUI. The car was a brown Mercury Marquis with a Texas license plate. Ann Guy was driving, and Robert Guy was in the passenger seat; Ann Guy had no driver's license. Hughes detected the odor of raw marijuana, and called for backup. When the Guys consented to a search of the car, Hughes found a portable CB radio tuned to channel 32, phone records, and a photograph of Poe's Ford LTD. Hughes later opened the duffle bag and the suitcase with the keys that had been found in Poe's car by Kellerhall. Both the bag and the suitcase were full of leafy green material, which was later tested and proven to be 48.1 pounds of marijuana.

3. This trip was documented by the Guys' receipt from the Sandman Motel in Rogersville, Tennessee, dated February 9, 1992.

4. The Guys' Howard Johnson's receipt dated March 7, 1992, was entered into evidence to document this trip.

5. Ann Guy testified that a trip was made around March 27, 1992, and that she had written the date on a wall calendar. The Guys' receipt from a Days Inn in Kingston, Tennessee, dated April 5, 1992, and their receipt from an Econo Lodge in Kingston, Tennessee, dated May 10, 1992, were also introduced as evidence.

Shelby County officers contacted the Sheriffs in both Fayette County[6] and Hawkins County. Chief Deputy Sheriff Bobby Smith testified that the Guys were charged with possession of marijuana with the intent for resale in Fayette County. Lt. Bob Moore testified that the Guys agreed to cooperate with authorities by making a controlled delivery of the drugs to the Muncey's in Hawkins County. Robert Guy was given a wire transmitter, and he and his wife took the marijuana to the Muncey's on the evening of May 27. Police officers followed the Guys to Bulls Gap, and monitored the transmitted conversation.

Ed Muncey was waiting when the Guys arrived. He asked Robert Guy to come inside because the appellant was on the phone; Guy recognized the appellant's voice. The appellant asked if everything was "okay," and also said that "they got Poe." Guy told Muncey and the caller that he knew Poe had been stopped near Memphis, and that he had pulled over to see whether Poe would merely get a traffic ticket. When they were not contacted by Poe, the Guys continued on their way. Guy also said that he had considered "dumping" the marijuana. According to Robert Guy, the appellant said that Muncey was unwilling to accept the marijuana because Poe had been arrested. Finally, the appellant said that he was sending Goodnight to Tennessee to straighten out the situation.[7]

Robert Guy testified that Ed Muncey instructed him to go to a motel, leave the marijuana in the trunk of the car, leave the key in the trunk, and get a room. Robert Guy believed that the instructions were from the appellant, so he complied. Law enforcement officers set up a watch of the motel, but no one came to pick up the marijuana. The Guys were taken back into custody in Fayette County. Robert Guy admitted that he made a statement to Fayette County authorities in which he failed to mention that the appellant had been present when the marijuana was packaged at Goodnight's. He and

Ann Guy also conceded that they intended to plead guilty to the offense in Fayette County, but would not be charged in Hawkins County. Although there was no written plea agreement in Fayette County, the Guys believed they would be sentenced to sixty days in jail, of which they had served forty-two, a $5,000 fine, and a period of probation. Robert Guy also admitted that his and Ann Guy's pretrial bonds had been lowered from $50,-000 to $5,000, but he did not know why.

James Goodnight, the appellant's brother in law, testified about his role in the operation. He resided in Waco, Texas, and made four trips to Ed Muncey's home in Tennessee at the appellant's instructions. Each time he delivered forty (40) to (50) pounds of marijuana. The marijuana was supplied by the appellant, and usually kept at Goodnight's home before being packaged for delivery.[8] Goodnight, usually with Robert Guy and William Poe, packaged the marijuana into plastic bags with baking soda. At the appellant's instruction, the bags were wrapped with duct tape and spray painted to mislead drug dogs. According to Goodnight, the appellant bought him a Ford Thunderbird for $2500; the car was equipped with hollowed out areas for concealing drugs. The appellant also provided expense money.

Goodnight testified that he and the appellant leased a dial pager from Renschler Communication Inc., in Waco, Texas. The account was in Goodnight's name, but the appellant used the pager and carried it "everywhere." The appellant paid the bill for the pager on one or two occasions; otherwise, Goodnight paid it. Goodnight also testified that the appellant used his telephone frequently and had access to his telephone credit card. Goodnight testified that he never used his telephone to call the Muncey's, Poe or Davis in Tennessee. Goodnight had phone bills between $300 and $400 dollars, but the appellant did not pay them. No one

---

6. Officer Hughes' stop of the Guys occurred after they had crossed from Shelby County into Fayette County.

7. The tape recording of the conversation was played for the jury. The voice of the person on

the other end of the call, ostensibly the appellant, is not evident on the tape.

8. On one occasion, Goodnight made a trip to Houston to pick up the drugs at the appellant's orders, and delivered them to Waco.

else had access to his phone, though he believed Poe had once made a call.

Goodnight flew to Tri–Cities Airport in Tennessee after Poe was arrested on May 27, 1992. He rented a car, and drove to Muncey's home.[9] The appellant had provided $400 for expenses, and told him to find out what had happened. Goodnight stayed at the Muncey's home on May 27, and was present when officers executed a search warrant there two days later.[10] He gave a statement to officers admitting his involvement, and telling officers that he was afraid of the appellant. He admitted, however, that the only reference to the appellant in his statement was that "Omar found out Will [Poe was] in jail."

Goodnight acknowledged that he had an agreement with the District Attorney in Hawkins County that he would "not be prosecuted" for his testimony. He also admitted that he had obtained the dial pager after the appellant's arrest, and then gave it to Texas authorities after being told that he would not be prosecuted in Texas. Goodnight admitted that in February of 1992, he rented a van in Kingsport, Tennessee, by providing false information. He also conceded that in March of 1992, he had obtained a Tennessee automobile registration by giving a false address. The Tennessee license plate he was given was found on Poe's Ford LTD.

Ed Muncey testified that he met the appellant when he was in the army and stationed in Texas. Poe, who was from East Tennessee, was also living in Texas at the time. After leaving the army, Muncey had no contact with the appellant for several years. It was through Poe that Muncey reestablished contact with the appellant around December of 1991. Thereafter, Muncey began to participate in the marijuana distribution in exchange for discounted marijuana, which he would sell for profit. According to Muncey, twelve or thirteen deliveries of marijuana were made to his home in Bulls Gap, Tennessee. The appellant called him soon before or soon after a shipment arrived. Generally, Muncey contacted the appellant by calling his residence in Waco, or the dial pager number.

According to Ed and Gloria Muncey, the Guys made five to seven deliveries of marijuana to their home between December of 1991 and May of 1992. The amount of marijuana in each delivery was between thirty-five (35) and eighty (80) pounds. Ed Muncey described the operation:

> William Poe would always run back and forth just all the time. I'd see him several times. After they had got started in their business, [Poe] kind of handled this end of it, and Omar [the appellant] was running the Texas end of it. Omar [the appellant] would round up the pot. Him [sic] and [James Goodnight] would package it and get it ready to ship.

Muncey also recalled a delivery made by the Guys in which marijuana had been concealed inside of James Goodnight's Ford Thunderbird.

After the marijuana was delivered, Muncey, Poe, and Richard Davis weighed, cut and wrapped the drugs for further distribution. Poe provided two sets of scales for weighing the marijuana. After it was packaged, it was placed into garbage bags and Poe and Richard Davis would leave with it. Poe had told Muncey that Davis could "move" a lot of marijuana. He recalled that William Poe often had large amounts of cash that he took back to Texas. On one occasion, Poe had a large sum of money, which they placed in a shoe box and wrapped. Gloria Muncey testified that Poe had twice given her money and sent her to the Western Union office in Rogersville. The first time, Poe instructed her to send money to his girlfriend in Waco; the second time, Poe told her to wire $2140 to the appellant's wife in Waco.[11]

9. Goodnight's airline ticket was found during officers' search of the Muncey's home and it was introduced into evidence.

10. The search turned up, among other items, an address book, Goodnight's airline ticket and a western union money transfer receipt made out to the appellant's wife, Rachel Santiago, for $2140.

11. This western union receipt was found during the search of the Muncey's home and introduced into evidence.

According to Ed Muncey, William Poe called him from Shelby County on May 27, 1992, and said he had been arrested. Poe told him not to take the marijuana, which he believed was still en route via the Guys. Muncey paged the appellant and told him that Poe had been arrested. The appellant told Muncey that Poe was "crazy," and insisted that Muncey should take the marijuana as planned. Instead, Muncey anonymously informed the police that marijuana was being delivered to Tennessee in a brown Mercury Marquis with Texas plates, i.e., the Guy's vehicle. The Guys arrived between 9:30 and 10:30 p.m. Muncey told the appellant by telephone that he did not want to take the marijuana under the circumstances. The appellant wanted someone to accept the delivery. Robert Guy spoke to the appellant. Muncey then told the appellant that "he'd take care of it," and he instructed Robert Guy to take the marijuana to a local motel and leave it in the trunk. He tried to call Richard Davis, and he talked "back and forth" to the appellant. The appellant said that Goodnight was on his way to Tennessee to straighten everything out. Goodnight arrived the next day.

On May 29, 1992, police searched the Muncey's home. Muncey turned himself in four or five days later. In exchange for his testimony, Ed Muncey had agreed to plead guilty to attempting to conspire to distribute over seventy (70) pounds of marijuana, a class C felony, with sentencing to be left to the judge. Gloria Muncey likewise had pled guilty to the class C felony in exchange for the state's recommendation that she receive five years probation.

Other witnesses saw marijuana at the Muncey's home, and knew about the drug operation. A house guest of the Muncey's, Erin Tuttle, testified that he was aware of the marijuana activities, but did not participate in them. He saw Poe and Richard Davis at the Muncey's putting marijuana into plastic bags. Poe once asked Tuttle to deliver some marijuana, but Tuttle refused; on another occasion, Tuttle saw Poe with a large

sum of money in a box. Two days before the search of the Muncey's home, Tuttle took a phone call from someone who asked for Ed Muncey to "call Omar." One day before the search, Tuttle met James Goodnight at the Muncey's; he heard Goodnight ask Gloria Muncey why the marijuana had not been accepted. One of the Muncey's neighbors, Amanda Gillenwater, testified that she met William Poe at the Muncey's in January of 1992; that same month, she saw marijuana stacked a foot high in the Muncey's kitchen. She also testified that she heard Gloria Muncey mention the appellant's name.

Sgt. Jose Luis Coy, Texas Department of Safety, testified that he saw the appellant and William Poe in the garage area of James Goodnight's residence in May of 1992. Coy also testified that Goodnight gave him the dial pager after the appellant's arrest. Coy's investigation verified that the pager had been leased by Goodnight Equipment Company in Waco. Another resident of Waco, Laura Sue Van Patrick, testified that she came into possession of some of William Poe's belongings in a duffle bag and footlocker following his arrest. Van Patrick called police. Among the items found and introduced into evidence was a business card for an automobile custom detail business; the card listed the appellant as the owner and William Poe as the manager.

The state introduced numerous telephone records to link the activities of the appellant, Goodnight, Poe, Ann and Robert Guy, and Ed Muncey for the time period in question.[12] Many of the calls to and from Waco, Texas, involved the East Tennessee residences of William Poe's relatives and friends. Mike Poe (his brother), Anita Poe (his sister in law), and Geraldine Poe (his mother), all testified that William Poe had access to, and frequently used, their telephones. Moreover, they also testified that they had not personally made or received calls to or from the appellant in Waco, as reflected on their phone bills. Similarly, Cindy Davis, Richard Davis's sister, testified that William Poe used

12. A detailed list of the telephone numbers, addresses, dates and times pertaining to the calls appears at the end of this opinion. The list is limited to the records of those calls made either

to or from the appellant's residence, or to the dial pager worn by the appellant. Other records, voluminous in nature, showed calls made to and from the other conspirators as well.

her telephone on a regular basis, and that she had not made or received calls to or from Waco. Her testimony was corroborated by that of her roommate, Van Christian.

Nancy Knight, custodian of records for United Telephone, testified that during December of 1991, and January of 1992, three calls were made to the appellant's residence in Waco, Texas, from the homes of Mike Poe in Kingsport, Tennessee, and Geraldine Poe in Church Hill, Tennessee. Knight further testified that from February to April of 1992, eleven calls were made to the dial pager leased by James Goodnight and worn by the appellant in Waco, Texas, from the Church Hill residence of Geraldine Poe. Two calls to the pager were made from the home of Mike Poe in Kingsport during March of 1992. Similarly, four calls to the pager were made in March of 1992 from the residence of Cindy Davis in Mt. Carmel, Tennessee.

David Duggan, record custodian for South Central Bell, testified that during December of 1991 and January of 1992, nineteen calls to the appellant's residence in Waco were either made from or billed to the Muncey's home in Bulls Gap, Tennessee. Duggan also testified that from February of 1992 to May of 1992, sixteen calls were placed to the Waco dial pager number from the Muncey's home.

Doris Pecina, record custodian for South Western Bell, testified that between March 27, 1992, and April 27, 1992, forty-one calls were placed to the dial pager in Waco, Texas, from various locations in Tennessee, and billed via credit card to William Poe. Of these, seventeen were made from Mike Poe's home in Kingsport, five were made from the Muncey's home in Bulls Gap, seven were made from Cindy Davis's home in Mt. Carmel, and two were made from Geraldine Poe's home in Church Hill. Again, all of these witnesses testified that William Poe often used their telephones and that they personally had never called Waco.

Similarly, Pecina testified that between April 1, 1992, and May 28, 1992, six calls to Tennessee were placed from the appellant's residence in Waco, Texas, and billed to the residence of James Goodnight via credit card. Of these, four calls were to the Muncey's home and two were to Cindy Davis's home.

One call to the appellant's home on May 29, 1992, had been made from the Muncey's home and billed to James Goodnight. Finally, Pecina testified that from December 21, 1991, to May 27, 1992, thirty-one calls to Tennessee were either made from or billed to the appellant's residence in Waco, Texas. Of these, twenty-three were to the Muncey's home, six were collect calls from Rogersville motels, one was to Cindy Davis's Mt. Carmel residence, and one was a collect call from the Hawkins County jail.

The state rested. The appellant presented no evidence other than to call Ronnie Lawson, a deputy with the Hawkins County Sheriff's Department, relative to statements made to police by Goodnight. Lawson testified that Goodnight had told him he was "afraid" of the appellant, and that he, Goodnight, had once seen a warehouse of marijuana in Waco. Lawson admitted that these statements were not in Goodnight's written statement, and he also acknowledged that Goodnight had not been arrested.

## I

When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn. 1985); Tenn.R.App.P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence, *id.,* nor should this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956).

The appellant was convicted of conspiracy to sell or distribute marijuana in excess of

seventy (70) pounds. A criminal conspiracy is defined in Tenn.Code Ann. § 39–12–103:

(a) The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

(b) If a person guilty of conspiracy ... knows that another with whom the person conspires to commit an offense has conspired with one (1) or more other people to commit the same offense, the person is guilty of conspiring with such other person or persons, whether or not their identity is known, to commit such offense.

(c) If a person conspires to commit a number of offenses, the person is guilty of only one (1) conspiracy so long as such multiple offenses are the object of the same agreement or continuous conspiratorial relationship.

(d) No persons may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired.

*　　*　　*　　*　　*　　*

At the time of this offense, it was unlawful for a defendant to knowingly manufacture, deliver, sell, or possess with the intent to manufacture, deliver, or sell a controlled substance. Tenn.Code Ann. § 39–17–417(a)(1)–(4). A violation with respect to over seventy (70) pounds of marijuana was designated a class B felony. Tenn.Code Ann. § 39–17–417(i)(13).

The testimony of the Guys, James Goodnight, and the Munceys, established the elements of the offense. *Jackson v. Virginia,* 443 U.S. at 318–19, 99 S.Ct. at 2788–89. Without fully reiterating the testimony, each witness identified the appellant as the supplier of the marijuana. Each identified the appellant as the person who monitored the deliveries of marijuana from Waco, Texas, to Bulls Gap, Tennessee. The Guys and the Munceys testified that the appellant first ap-proached them to participate in the marijuana operation, and that they agreed with the appellant to deliver marijuana from Waco to Tennessee. Goodnight testified that the appellant supplied the marijuana, and that it was often stored at his home to be packaged. The testimony of the Guys, Goodnight, and the Munceys established that the weight of the marijuana in the deliveries totaled well over seventy pounds.

■ The appellant, however, complains that the evidence was insufficient because there was no independent corroboration of the testimony of the accomplices. He argues that (a) the Guys, the Munceys and James Goodnight were accomplices to the offense, and that (b) there was no evidence to independently corroborate their testimony. It is clear in Tennessee that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. Our court has said:

> The Supreme Court of this State has addressed itself many times to the question of the character and quality and quantum of evidence necessary to constitute legally sufficient corroboration of an accomplice. The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must include some facts establishing the defendant's identity.... This corroborative evidence may be direct or circumstantial, and it need not be adequate in and of itself to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the crime charged.

*Henley v. State,* 489 S.W.2d 53, 56 (Tenn. Crim.App.1972); *see Mathis v. State,* 590 S.W.2d 449, 454 (Tenn.1979); *State v. Fowler,* 213 Tenn. 239, 373 S.W.2d 460, 463 (1963); *Clapp v. State,* 94 Tenn. 186, 30 S.W. 214, 216 (1895). An accomplice is "a person who knowingly, voluntarily, and with common intent with the principal offender, unites in the commission of a crime." *Clapp v. State,* 94 Tenn. 186, 30 S.W. at 216; *see also State v.*

*Gaylor,* 862 S.W.2d 546, 552 (Tenn.Crim.App. 1992), *perm. to appeal denied* (Tenn.1993).

The jury is to determine the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient if "there is some other evidence fairly tending to connect the defendant with the commission of the crime." *Clapp v. State,* 30 S.W. at 217; *Marshall v. State,* 497 S.W.2d 761, 765–66 (Tenn.Crim.App.1973). Slight circumstances may be sufficient to furnish the necessary corroboration, provided they satisfy the above standards, *Garton v. State,* 206 Tenn. 79, 332 S.W.2d 169, 173–75 (1960), and the corroboration need not extend to every part of the accomplice's testimony. *State v. Fowler,* 373 S.W.2d at 463; *see also State v. Gaylor,* 862 S.W.2d at 552; *McKinney v. State,* 552 S.W.2d 787, 789 (Tenn.Crim.App. 1977).

We conclude that the evidence of corroboration, when viewed in a light most favorable to the state, was sufficient to sustain the appellant's conviction. The prosecution presented extensive evidence of phone records that not only linked the accomplices to the appellant, but did so in patterns and during times that lent a fair and legitimate inference that the appellant was involved in the crime. All of the calls were made between December of 1991 and May of 1992. Nineteen calls were made direct to the appellant's residence from the Muncey's home in December and January, the time the marijuana conspiracy was beginning to unfold. Three calls were made direct to the appellant's residence in December and January from the homes of William Poe's relatives. One call to the appellant's home was made on May 29, 1992, from the Muncey's home and billed to James Goodnight. Thirty-seven calls were placed from the appellant's Waco residence to various relevant Tennessee locations and residences from December of 1991 to May of 1992. Of these, twenty-seven were made to the Muncey's home.

In addition, numerous calls were placed to a dial pager in Waco purportedly worn and used by the appellant. Seventeen such calls were made from the homes of William Poe's relatives and Cindy Davis in February through March of 1992. Mike Poe, Geraldine

Poe, Anita Poe, Cindy Davis, and Van Christian, none of whom were accomplices, testified that William Poe used their phones numerous times, and that they personally had made no calls to Waco. Additionally, sixteen calls were made to the pager from the Muncey's home from February to May of 1992, and forty calls to the pager were made from various Tennessee locations and billed to William Poe from March 27 to April 27 of 1992. At least ten of the above calls, whether to or from the appellant's residence, or to the pager, occurred from May 27, 1992, to May 29, 1992, the period in which the conspiracy began to unravel.

While these records, in and of themselves, may not be sufficient evidence to convict, they are persuasive indications of the appellant's involvement. *See McKinney v. State,* 552 S.W.2d at 790 (considering evidence of phone records as corroborative). Moreover, the dates and timing of the calls, we think, fairly and legitimately implicate the appellant in the conspiracy by corroborating portions of the accomplices' testimony. For instance, numerous calls to the appellant's residence were made in the beginning months of the operation. Calls to the pager worn by the appellant began to occur and then increase from February to May of 1992. Finally, calls from the appellant's residence to other conspirators were made throughout. All of the calls coincided with the approximate dates of marijuana deliveries to Tennessee.

Other evidence likewise corroborated portions of the accomplices' testimony. Erin Tuttle and Amanda Gillenwater, neither of whom were accomplices, saw marijuana at the Muncey's home, and heard references to "Omar." Tuttle took a message to have Ed Muncey call "Omar." Jose Luis Coy, a police officer, saw the appellant, Robert Guy and James Goodnight in May of 1992, in the garage area of Goodnight's home, i.e., the area where most of the marijuana was packaged and loaded. Coy also saw Goodnight's Ford Thunderbird in Waco, and took possession of the dial pager that had been leased by Goodnight. Although these facts, in and of themselves, were insufficient to convict the appellant, when viewed in the light most favorable to the prosecution, they were suffi-

cient for the jury to fairly and legitimately connect the appellant with the offense. *See, e.g., Henley v. State,* 489 S.W.2d at 56. When coupled with the accomplices' testimony, the evidence was, therefore, sufficient to sustain the conviction.

## II

■ When a defendant challenges the length, range or manner of service of a sentence, the reviewing court must conduct a *de novo* review on the record with a presumption that the determinations made by the trial court were correct. Tenn.Code Ann. § 40–35–401(d) (1990 Repl.). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby,* 823 S.W.2d 166, 169 (Tenn.1991).

■ The sentence to be imposed by the trial court is presumptively the minimum within the applicable range unless there are enhancement factors present. Tenn.Code Ann. § 40–35–210(c)(1990 Repl.). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn.Code Ann. § 40–35–210(d) and (e)(1990 Repl.). The weight to be afforded each factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Tenn. Code Ann. § 40–35–210 (sentencing commission comments); *see also State v. Shelton,* 854 S.W.2d 116, 123 (Tenn.Crim.App.1992).

Here, the appellant was convicted of a class B felony and sentenced as a range I standard offender. The applicable range was eight to twelve years in the Department of Correction. The evidence at sentencing included the presentence report and certified copies of the appellant's prior convictions. Also, the appellant testified that his only involvement in the offense was to introduce William Poe to the actual supplier of the marijuana, a Mr. Juan Flores. The appellant asked for the court's mercy.

■ In imposing the maximum sentence, the trial court found that three enhancement factors applied:

(1) the appellant had a prior criminal history;

(2) the appellant was a leader in the commission of an offense involving two or more criminal actors; and

(3) the appellant committed the offense while on parole or probation for a prior felony offense.

Tenn.Code Ann. § 40–35–114(1), (2), and (13)(1990 Repl. and 1994 Supp.). In support of –114(1), the trial court considered certified copies of three prior convictions: possession with intent to distribute over fifty kilos of marijuana in the U.S. District Court for the Southern District of Texas in 1989; possession with intent to distribute marijuana in New Jersey Superior Court in 1989; and possession of marijuana in Texas county court in 1983. The presentence report also indicated that in 1990 the appellant was convicted in New Jersey Superior Court for possession of a controlled substance with intent to distribute, and unlawful possession of a weapon. The report indicated that he was sentenced to five years for each offense; and the trial court concluded that this warranted enhancement based on –114(13), i.e., the appellant was on probation or parole for these convictions when he committed the present offense. Finally, in finding that the appellant was a leader in the offense, the trial court said:

> [Y]ou were guilty as a major participant in this conspiracy, there is no question about that. . . . [I]t was operated something like a business. [I]f it were a business, I think that it is fair to say that the evidence characterizes you as the president of the corporation or chairman of the board. Along the same line, I would say that Mr. Poe was the marketing director. . . . As to the man and his wife that got caught in west Tennessee, [they] were no more than common carriers. I don't think there [was] any question that you were a leader in the offense. You don't have to necessarily be the leader, but you were a leader. . . .

The appellant has not overcome the presumption of correctness with regard to any of these enhancement factors. Moreover, the state accurately notes that the appellant's failure to abide by the terms of prior sentences involving release into the community supported the application of –114(8).

 The appellant's only argument is that the trial court should have reduced the sentence to reflect the fact that the offense "neither caused nor threatened serious bodily injury." *See* Tenn.Code Ann. § 40–35–113(1). The trial court did apply this factor, but gave it little weight:

> It might be argued that this was a non-violent offense. In a technical sense, it is and technically should be considered as a mitigating factor ... [I]t wouldn't be [of] strong ... weight, because indirectly drugs are extremely harmful, but I would recognize that ... technically it is a mitigating factor.

Nonetheless, the trial court imposed the maximum sentence due to the strength of the enhancement factors. We conclude that the appellant has again failed to overcome the presumption of correctness attendant to the trial court's sentencing determination. The fact that the trial court recognized the applicability of one mitigating factor does not automatically entitle the appellant to a reduction in the sentence. *See e.g., State v. Moss*, 727 S.W.2d 229, 235 (Tenn.1986). As noted above, the weight to be afforded each factor is left to the trial court. In this case, those findings are supported by the record.

The judgment is affirmed.

SUMMERS and HAYES, JJ., concur.

### APPENDIX

1. Calls direct to the appellant's residence (817) 752–7138, either made from or billed to (615) 235–4613, the residence of Ed and Gloria Muncey in Bulls Gap, TN:

> *December 7, 1991*—5:44 p.m.
> *December 21, 1991*—8:12 p.m.
> *January 7, 1992*—11:27 a.m.
> *January 7, 1992*—11:32 a.m.
> *January 7, 1992*—5:16 p.m.
> *January 7, 1992*—7:48 p.m.

> *January 9, 1992*—9:28 a.m.
> *January 9, 1992*—11:29 a.m.
> *January 9, 1992*—5:09 a.m.
> *January 9, 1992*—6:54 p.m.
> *January 18, 1992*—9:14 a.m.
> *January 18, 1992*—6:41 p.m.
> *January 18, 1992*—6:47 p.m.
> *January 19, 1992*—3:14 p.m.
> *January 21, 1992*—9:58 p.m.
> *January 22, 1992*—8:59 p.m.
> *January 31, 1992*—10:09 a.m.
> *January 31, 1992*—10:50 p.m.
> *January 31, 1992*—11:42 p.m.

2. Calls direct to the appellant's residence, (817) 752–7138, made from (615) 245–5321, the residence of Mike Poe in Kingsport, TN, or from (615) 357–7596, the residence of Geraldine Poe in Church Hill, TN:

> *December 21, 1991*—9:57 p.m. (Mike Poe's)
> *January 24, 1992*—10:47 a.m. (Geraldine Poe's)
> *January 24, 1992*—8:11 p.m. (Geraldine Poe's)

3. Call direct to the appellant's residence, (817) 752–7138, made from the residence of Ed and Gloria Muncey and billed to the residence of James Goodnight:

> *May 29, 1992*—3:08 p.m.

4. Calls made from (or billed to) the appellant's residence, (817) 752–7138, to (or from) various locations in Tennessee:

> *December 21, 1991*—11:07 p.m. (to Muncey's home)
> *January 7, 1992*—9:57 a.m. (to Muncey's home)
> *January 9, 1992*—8:25 a.m. (to Muncey's home)
> *January 9, 1992*—3:59 p.m. (to Muncey's home)
> *January 20, 1992*—12:23 p.m. (to Muncey's home)
> *January 20, 1992*—2:29 p.m. (to Muncey's home)
> *January 21, 1992*—4:33 p.m. (to Muncey's home)
> *January 21, 1992*—7:55 p.m. (to Muncey's home)

*January 22, 1992*—12:05 p.m. (to Muncey's home)

*January 22, 1992*—4:13 p.m. (to Muncey's home)

*January 22, 1992*—5:34 p.m. (to Muncey's home)

*January 24, 1992*—10:08 p.m. (to Muncey's home)

*January 25, 1992*—9:13 a.m. (to Muncey's home)

*January 25, 1992*—6:39 p.m. (to Muncey's home)

*January 25, 1992*—7:08 p.m. (to Muncey's home)

*January 25, 1992*—9:11 p.m. (to Muncey's home)

*January 29, 1992*—12:32 p.m. (to Muncey's home)

*January 30, 1992*—12:43 p.m. (to Muncey's home)

*January 30, 1992*—11:18 p.m. (Collect, Sandman Motel)

*January 31, 1992*—8:41 a.m. (to Muncey's home)

*January 31, 1992*—9:28 a.m. (to Muncey's home)

*January 31, 1992*—6:01 p.m. (Collect, Sandman Motel)

*February 2, 1992*—1:09 p.m. (to Muncey's home)

*February 2, 1992*—1:23 p.m. (to Cindy Davis' home)

*February 2, 1992*—8:06 p.m. (to Muncey's home)

*February 3, 1992*—7:15 p.m. (to Muncey's home)

*April 9, 1992*—5:42 p.m. (Collect from Rogersville)

*April 9, 1992*—11:15 p.m. (Collect, Sandman Motel)

*April 10, 1992*—9:25 a.m. (Collect, Sandman Motel)

*April 10, 1992*—11:31 a.m. (Collect, Sandman Motel)

*May 27, 1992*—5:19 a.m. (Collect, Hawkins County Jail)

5. Calls from the appellant's residence, (817) 752–7138 or (817) 752–4917, to various locations in Tennessee, and billed to the residence of James Goodnight via credit card:

*April 1, 1992*—8:40 p.m. (to Cindy Davis's home)

*April 4, 1992*—9:59 p.m. (to Muncey's home)

*April 7, 1992*—9:31 p.m. (to Muncey's home)

*April 30, 1992*—10:34 a.m. (to Cindy Davis's home)

*May 27, 1992*—10:56 p.m. (to Muncey's home)

*May 28, 1992*—5:01 a.m. (to Muncey's home)

6. Calls made to the dial pager, (817) 750–0390, from (615) 357–7596, the home of Geraldine Poe, Church Hill, TN:

*February 20, 1992*—9:39 a.m.

*February 20, 1992*—9:41 a.m.

*February 20, 1992*—9:41 a.m. (second call)

*February 20, 1992*—1:55 p.m.

*February 20, 1992*—1:56 p.m.

*March 27, 1992*—10:12 a.m.

*March 27, 1992*—10:13 a.m.

*March 27, 1992*—10:14 a.m.

*March 27, 1992*—10:42 a.m.

*March 29, 1992*—9:18 p.m.

*April 7, 1992*—10:57 p.m.

7. Calls made to the dial pager, (817) 750–0390, from (615) 245–5321, the residence of Mike Poe in Kingsport, TN:

*March 24, 1992*—9:31 p.m.

*March 26, 1992*—4:24 p.m.

8. Calls made to the dial pager, (817) 750–0390, from (615) 357–1960, the residence of Cindy Davis in Mt. Carmel, TN:

*March 8, 1992*—11:10 p.m.

*March 8, 1992*—11:11 p.m.

*March 28, 1992*—4:16 p.m.

*March 28, 1992*—4:17 p.m.

9. Calls made to the dial pager, (817) 750–0390, from (615) 235–4613, the residence of Ed and Gloria Muncey:

*February 12, 1992*—1:42 p.m.

*February 12, 1992*—1:42 p.m. (second call)

*February 20, 1992*—4:09 p.m.

*February 20, 1992*—4:09 p.m. (second call)

*February 20, 1992*—4:10 p.m.

*February 20, 1992*—4:11 p.m.

*February 20, 1992*—9:42 p.m.

*February 20, 1992*—9:43 p.m.

*April 7, 1992*—8:56 p.m.

*May 27, 1992*—9:17 p.m.

*May 27, 1992*—11:54 p.m.

*May 28, 1992*—5:57 a.m.

*May 28, 1992*—6:16 a.m.

*May 28, 1992*—6:23 a.m.

*May 28, 1992*—3:37 p.m.

*May 28, 1992*—5:12 p.m.

10. Calls made to the dial pager, (817)750–0390, from various locations in Tennessee, and billed via credit card to William Poe:

*March 27, 1992*—7:55 p.m. (from Muncey's home)

*March 29, 1992*—10:31 p.m. (from Cindy Davis's home)

*March 29, 1992*—10:32 p.m. (from Cindy Davis's home)

*March 31, 1992*—1:50 p.m. (from Mike Poe's home)

*March 31, 1992*—1:51 p.m. (from Mike Poe's home)

*March 31, 1992*—7:11 p.m. (from Geraldine Poe's home)

*March 31, 1992*—7:54 p.m. (from Mike Poe's home)

*March 31, 1992*—7:56 p.m. (from Mike Poe's home)

*April 1, 1992*—3:30 p.m. (from Mike Poe's home)

*April 1, 1992*—5:18 p.m. (from Mike Poe's home)

*April 1, 1992*—5:30 p.m. (from Mike Poe's home)

*April 1, 1992*—9:25 p.m. (from Cindy Davis's home)

*April 4, 1992*—6:39 p.m. (from Muncey's home)

*April 4, 1992*—6:41 p.m. (from Muncey's home)

*April 7, 1992*—10:56 p.m. (from Church Hill)

*April 7, 1992*—11:18 p.m. (from Church Hill)

*April 7, 1992*—11:20 p.m. (from Geraldine Poe's home)

*April 8, 1992*—10:29 a.m. (from Mike Poe's home)

*April 8, 1992*—10:30 a.m. (from Mike Poe's home)

*April 10, 1992*—12:23 p.m. (from Cindy Davis's home)

*April 10, 1992*—12:24 p.m. (from Cindy Davis's home)

*April 14, 1992*—12:17 p.m. (from Church Hill)

*April 14, 1992*—12:18 p.m. (from Church Hill)

*April 14, 1992*—12:32 p.m. (from Church Hill)

*April 14, 1992*—10:13 p.m. (from Muncey's home)

*April 14, 1992*—10:14 p.m. (from Muncey's home)

*April 16, 1992*—7:35 p.m. (from Mike Poe's home)

*April 16, 1992*—7:36 p.m. (from Mike Poe's home)

*April 16, 1992*—8:41 p.m. (from Mike Poe's home)

*April 17, 1992*—12:56 p.m. (from Kingsport, TN)

*April 19, 1992*—10:54 a.m. (from Cindy Davis's home)

*April 19, 1992*—10:56 a.m. (from Cindy Davis's home)

*April 20, 1992*—11:52 a.m. (from Mike Poe's home)

*April 20, 1992*—12:26 p.m. (from Mike Poe's home)

*April 20, 1992*—12:27 p.m. (from Mike Poe's home)

*April 26, 1992*—9:31 p.m. (from Mike Poe's home)

*April 26, 1992*—9:50 p.m. (from Mike Poe's home)

*April 27, 1992*—7:27 p.m. (from Hershey, PA)

*April 27, 1992*—7:28 p.m. (from Hershey, PA)

*April 27, 1992*—7:29 p.m. (from Hershey, PA)

*April 27, 1992*—8:03 p.m. (from Hershey, PA)