IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2004

## STATE OF TENNESSEE v. KAWISHA PRICE

**Appeal from the Circuit Court for Gibson County**
**No. H 7161   Clayburn Peeples, Judge**

_____

**No. W2003-00753-CCA-R3-CD  - Filed July 8, 2004**

_____

The appellant, Kawisha Price, was indicted for aggravated child abuse.  She entered a best-interest plea to aggravated assault with a sentence of eight years as a Range II multiple offender, with the trial court to determine the manner of service of the sentence.  The trial court subsequently ordered her to serve the sentence in confinement.  She appeals, arguing that the trial court decided the manner of service of the sentence before any proof was offered on her behalf and erred in ordering her to serve the sentence in confinement.  For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, and JAMES CURWOOD WITT, JR., JJ., joined.

Periann S. Houghton, Assistant Public Defender, Trenton, Tennessee for the appellant, Kawisha Price.

Paul G. Summers, Attorney General & Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Gary Brown, District Attorney General; and Elaine Gwinn Todd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Factual Background

In April of 2002, the appellant was indicted for the aggravated child abuse of her infant daughter.  Pursuant to settlement with the State, the appellant originally pled guilty to aggravated child neglect, with the sentence to be determined by the trial court.  She later withdrew that plea and entered a best-interest plea to aggravated assault with a sentence of eight years as a Range II, multiple offender with the trial court to determine the manner of service of the sentence.  At the sentencing hearing, the prosecutor stated that if the case had gone to trial, the proof would have

shown that on August 8, 2001, the infant daughter of the appellant suffered second degree burns over nine percent (9%) of her body when the appellant gave her a bath and that the injuries could not have been inflicted in the manner described by the appellant. After the trial court accepted the plea, both the State and the appellant proceeded to introduce testimony from various witnesses prior to the trial court's decision on sentencing.

Sergeant Dennis Wright of the Humboldt Police Department was notified on the morning of August 9, 2001, that a baby was taken to Humboldt General Hospital with severe injuries the night before and subsequently transferred to LeBonheur Hospital in Memphis. That afternoon, Sergeant Wright traveled to Memphis where he photographed the infant's injuries, spoke with the social worker, and spoke with the appellant.

Sergeant Wright interviewed the appellant both at the hospital and again several days later at the police station. She gave essentially the same version of events during both interviews. During the interview at the police department she stated:

> Sir I was giving her a bath and I let the water run before I put her in the water and it was too hot I did not check the water it was just too hot and it burned her face. . . . [when she put the child under the water] she jumped back and that's when I felt the hot water and that's when I pulled her back out of the water. . . . [The child was in the water] for about a minute or two it wasn't even that long, cause soon as I put her under there she jumped back and I pulled her back and I just seen [sic] her face it was peeling.

Sergeant Wright observed that the appellant was "very cold, aloof and totally unremorseful" and that she "showed no concern whatsoever with the injuries the child sustained."

As a result of the appellant's statement, Sergeant Wright asked the appellant for permission to test the water temperature at her apartment. She agreed, but Sergeant Wright was required by the Housing Authority to obtain a search warrant prior to his entry to the apartment. On the day he tested the water with a candy thermometer, the water reached a temperature of 125 degrees in less than one minute. Sergeant Wright inspected the hot water heater, which was kept under lock and key, to insure that it had not been tampered with prior to his inspection. At the time he inspected the unit, it had cobwebs on it and appeared to be undisturbed. Sergeant Wright also observed the appellant had been heating a bottle in the microwave.

Shamaricus Hunt, the victim's father, was asleep at the time of the offense. The appellant and her brother had gone out to "play spades" and he was left with the victim. He remembers the appellant waking him up and they immediately took the child to the hospital. Mr. Hunt stated that the appellant told him that she was giving the victim a bath when the injuries occurred, that she appeared to be in shock, and that she was crying, but not hysterical. Mr. Hunt did not believe that the injuries were intentional.

Dr. Robert Van Walling, a pediatrician and Director of the Crisis Center at LeBonheur, saw the victim on August 10, 2001. He described the infant's injuries as second degree burns over approximately 7% of her total body surface, with most of the burns being located on her face. During the hospital stay, the victim had to be fed through a feeding tube because bottle feedings were too painful. While the victim was at the hospital, Dr. Walling spoke with the appellant on several occasions. He also took photographs of the injuries. Dr. Walling described the appellant's actions as defensive, focusing on her own needs and what was going to happen to her. Based on the injuries sustained, Dr. Walling felt that the temperature at most was 127 degrees. He described comfortable bathing temperature as 98-101 degrees and typical hot tub temperature as 106-108 degrees. In his expert opinion, the child would have had to be under the water from one to two minutes to sustain the type of burns that she received if there was no cold water mixed in with the hot water. He felt that if the appellant had been holding the victim under the water, the appellant would have felt pain in her hand. Dr. Walling concluded that the "burns and pattern of the burns and how they occurred is not consistent with the story that - - which she tells us."

The Department of Children's Services ("DCS") took steps to determine whether to return the infant to the appellant. Leslie Nelms, a team leader with DCS, attended three supervised home visits between the appellant and the child and determined that the appellant's behavior was appropriate. Both the appellant and the infant's father, Shamaricus Hunt, attended an initial interview and evaluation at LeBonheur Center for Parents and Children concerning a permanency plan, but neither attended a later appointment with a mental health professional or subsequent parenting classes. That appointment was rescheduled and, again, the appellant failed to attend. Ms. Nelms stressed the importance of these meetings to the appellant, even calling her several times to remind her of appointment dates. The appellant never contacted Ms. Nelms about the missed appointments. Ms. Nelms also never heard the appellant express remorse over what happened to the infant. DCS gave legal custody of the victim to the paternal grandmother after a finding of severe child abuse. DCS has since discontinued visitation between the child and the appellant.

Beverly Hunt, the victim's paternal grandmother, received legal custody in October of 2001. At the time of the sentencing hearing, the victim was two years old and still had scarring on both the right and left side of her face, as well as along her jaw line and the side of her nose. The scarring was described as permanent unless the victim underwent further surgery. Prior to the hearing, Ms. Hunt allowed the appellant to have unsupervised visitation with the victim. After seeing the pictures and hearing the testimony, however, she had reservations about allowing the appellant to have visits with the child.

William Seward, the appellant's uncle, went to the hospital the night of the offense. He observed the appellant as disturbed and upset, but admitted that she was not crying. He also stated that the appellant did not have a drug or alcohol problem.

Laquezi Champion, the appellant's aunt, stated that she was around the appellant on a daily basis and observed the appellant's interaction with the appellant's other child as appropriate. The appellant called Ms. Champion on the night of the offense and asked her to come to the hospital.

Ms. Champion described the appellant as hysterical. Ms. Champion did not feel the injuries were intentional.

The appellant testified at the hearing that she was 22 years old and, in addition to the victim, has a four-year-old daughter. She claims that she was not upset with the victim at the time of the offense, but that the victim had been crying, so she attempted to calm her by giving her a bath. The appellant stated that she turned the water on and began washing the child's hair before she tested the temperature of the water. She denied placing the child's face under the water, claiming instead that the water from the child's hair ran onto her face. The appellant testified that when she saw the child jerk and move her head, she quickly pulled the victim away from the water and saw that her skin was peeling. The appellant said that the water was not hot enough to burn her hand and that she never meant to harm the child. She further claimed that the Housing Authority knew that the water was too hot and had the water turned down before Sergeant Wright checked it.

As to her failure to attend parenting classes, the appellant claimed she did not know anything about them. Since DCS removed the child from her custody, however, the appellant has been attending parenting classes every Thursday at the Carl Perkins Center. She is now employed by the Tennessee State Veteran's Home.

At the conclusion of the proof from both the State and the appellant, the trial court made the following findings:

> The question that obviously remains is whether or not the evidence shows that the sentence should be served within the Department of Correction or within - - some other way. The State did not allege any aggravating factors; however, my understanding is I'm still required to evaluate the case in accordance with the proof that has been shown in the sentencing hearing and I'm required to look to several sources when I do that. First of all, I'm required to look at what the purposes of punishment in the State of Tennessee are. Generally, they're said to be - - to fall in four different categories. First of all, deterrence. Second, isolation or incapacitation. Third, rehabilitation, and fourth retribution. Now, retribution is considered by just about everybody to be a non-utilitarian purpose and that will not be considered by the Court to be a legitimate function of the law. Now, deterrence is generally considered to be of two types, both a general deterrence and special deterrence. General deterrence is when we punish one person so that everybody else can see what has happened and, perhaps, be encouraged to obey the law. Special deterrence is when we punish one person in hopes that they will not violate the law again. Related to deterrence is the educative aspect of the law. . . . I do find that the Defendant's criminal record or lack of criminal record, in this case, is a mitigating factor, but I have to balance mitigating factors against whatever aggravating factors exist, and also what I would refer to as the need of society for moral symmetry between crime and punishment. Statute reads to avoid depreciating the seriousness of the offense.

I find that the victim in this case was particularly vulnerable because of her age. I find that even in these - if this activity was, in fact, reckless rather than knowing, it was intentionally exceptionally cruel treatment under the circumstances. Of course, those would have blended into the offense of aggravated child abuse, but that's not what she has pled guilty to. So I consider them to be aggravating circumstances.

I do not find that the Defendant has made any significant efforts at all to rehabilitate herself in order to protect her children in the future. I think the proof shows on the contrary that she resisted such efforts. That the State and various agencies or just one agency has made to provide that. I reluctantly and sorrowfully find that if I follow what I understand the law of the State of Tennessee to be I must order her to serve that sentence in its entirety with the Department of Correction.

The appellant subsequently filed a timely notice of appeal. She challenges the trial court's decision ordering her to serve her eight-year sentence in confinement and alleges that the trial court made its determination regarding sentencing prior to the presentation of any proof from the appellant.

## Sentencing

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

Turning more specifically to the facts of this case, the appellant entered a best interest plea to aggravated assault and agreed to an eight-year sentence to be served as a Range II multiple offender. The only issue before the court was the manner of service of the sentence.

The appellant first alleges that the trial court pre-determined her sentence prior to hearing the defense proof. Citing only to a docket sheet, the appellant claims that the trial court ordered her to serve her sentence in incarceration prior to the conclusion of the hearing. The State argues that the record does not support the appellant's claim.

The hearing took place on March 13 and 14 of 2003. According to the transcript, on March 13, the trial court accepted the guilty plea, heard opening arguments from counsel, and heard all of the State's proof. On March 14, the trial court heard proof from the defense and made an oral ruling in which the court determined that the appellant should serve her sentence in confinement. The docket sheet contained in the record contains the following entry for March 13, 2003: "Plea of guilty to agg assault (c felony) sent to serve eights years at 35% as multiple offender." Written on the next line appear the words "report 3-21-03 @ 7:00 a.m." The judgment sheet, entered on March 14, 2003 and filed on March 20, 2003, indicates that on March 14, the "Judge determined that no part of the sentence is to be suspended. Designated place of confinement Tennessee Department of Corrections, defendant to report for service March 21, 2003 at 7:00 a.m." According to the transcript of the hearing, the trial court's oral ruling was made at the conclusion of all the proof at the end of the day on March 14, 2003. Thus, there is an apparent conflict between the court minutes and the transcript. The minutes reflect that the appellant was ordered to serve the sentence on March 13, prior to the presentation of her proof, and the transcript reflects that the trial court made the sentencing determination at the conclusion of all the proof on March 14.

Ordinarily, when conflicts exist between evidence transcripts and court minutes, the transcripts control. State v. Clark, 67 S.W.3d 73, 79 (Tenn. Crim. App. 2001) (citing State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991)). We determine that in this case there is no reason to believe otherwise[1]. The trial court's ruling and the entry of the judgment occurred at the conclusion of all the proof on March 14, 2003. This issue is without merit.

With respect to the appellant's challenge to the trial court's determination that she should serve her sentence in the Department of Correction, we note that the appellant is eligible for probation. See Tenn.Code Ann. § 40-35-303(a). However, because the appellant was sentenced as a Range II multiple offender for a Class C felony she is not presumptively entitled to an alternative sentence. See Tenn. Code Ann. § 40-35-102(6). Furthermore, in determining whether to grant probation, the trial court must consider the nature and circumstances of the offense; the defendant's criminal record, her background and social history; her present condition, including physical and mental condition; and the deterrent effect on the defendant. See State v. Souder, 105 S.W.3d 602,

---

[1] Although it appears that the words "report 3/21/03 @ 7:00 am" are written in different handwriting, the fact remains that a conflict exists between the transcript and the court minutes. We have no choice but to determine the transcript controls.

607 (Tenn. Crim. App. 2002); State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999). The burden was on the appellant to show that she was a suitable candidate for probation. Tenn. Code Ann. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). To meet this burden, a defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. Tenn. Code Ann. § 40-35-103(2); State v. Batey, 35 S.W.3d 585, 588-89 (Tenn. Crim. App. 2000). Indeed, individualized punishment is the essence of alternative sentencing. State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986).

The trial court denied the appellant split confinement or probation on the basis that confinement was necessary to avoid depreciating the seriousness of the offense, and due to the appellant's apparent lack of remorse for her actions and failure to rehabilitate herself. These are appropriate grounds for the denial of an alternative sentence. Tenn. Code Ann. § 40-35-103(1); Dowdy, 894 S.W.2d at 306; State v. Treca Finchum, No. E2001-01072-CCA-R3-CD, 2002 WL 31190924, at *9 (Tenn. Crim. App. at Knoxville, Oct. 2, 2002), perm. to appeal denied (Tenn. 2003).

The victim's grandmother and legal custodian testified that the appellant's actions had permanently scarred the child's face. The medical expert testimony presented at the hearing indicated that the child's burns could not have occurred in the manner the appellant claimed. In fact, Dr. Walling felt it would have been necessary for the child to be under water for one to two minutes in order to sustain the type of burns she received. The appellant failed to attend classes as mandated by the permanency plan created by DCS. Moreover, the undisputed facts of this case show that in actuality the appellant's actions most likely constituted aggravated child abuse. See Tenn. Code Ann. § 39-15-402. That offense, as a Class A felony, is not subject to probationary sentencing. See State v. Hollingsworth, 647 S.W.2d 937, 939 (Tenn. 1983) (holding that a trial judge in considering probation may properly look behind a plea bargain to the true nature of the offense committed). We conclude that the trial court properly ordered the appellant to serve her sentence in confinement as the evidence in the record wholly supports that conclusion.

Conclusion

After a thorough review of the record, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE