# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2000

## STATE OF TENNESSEE v. HAROLD WAYNE SHAW

**Appeal as of Right from the Criminal Court of Davidson County**
**No. 95-D-2761     Seth Norman, Judge**

---

### No. M1999-01119-CCA-R3-CD - Filed October 27, 2000

---

The defendant, Harold Wayne Shaw, was convicted by a Davidson County jury of second-degree murder and aggravated kidnapping in 1996. The trial court sentenced the defendant as a Range II offender to serve eighteen (18) years for the aggravated kidnapping and thirty-five (35) years for the second-degree murder, both sentences to be served consecutively. Following the defendant's direct appeal, this Court affirmed the defendant's conviction but remanded the case to the trial court for resentencing because the trial court mistakenly sentenced the defendant as a Range II, persistent offender, misapplied two statutory enhancement factors, and failed to make findings of fact and conclusions of law sufficient to support the imposition of consecutive sentences. The trial court then resentenced the defendant as a Range I, standard offender to serve ten (10) years for the aggravated kidnapping and twenty-two (22) years for the second-degree murder. The court again ordered the sentences to be served consecutively. On appeal, this Court finds (1) that the length of the defendant's sentence is appropriate, and (2) that although the record does not support the trial court's finding that the defendant is a professional criminal, the trial court was correct in finding that the defendant has an extensive criminal history; thus consecutive sentences are also appropriate. The judgment of the trial court is therefore affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court of Davidson County is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and ROBERT W. WEDEMEYER, J., joined.

Jeffery A. DeVasher, Assistant Public Defender, on appeal, and Wendy S. Tucker, Assistant Public Defender, at trial, Nashville, Tennessee for the appellant, Harold Wayne Shaw.

Paul G. Summers, Attorney General and Reporter, Todd R. Kelley, Assistant Attorney General, Nashville, Tennessee and Victor S. Johnson, District Attorney General and Kimberly Haas, Assistant District Attorney, Nashville, Tennessee, for the appellee, State of Tennessee.

# OPINION

## Factual Background

The facts surrounding this case were summarized by this Court following the defendant's direct appeal as follows:

On December 29, 1993, at approximately 10:00 p.m., police officers and an ambulance were dispatched to G-Man's Market on Brick Church Pike in Nashville in response to a call that a shooting had occurred. Upon arrival, they found 24-year-old Corey Barbee on the floor, bleeding from several gunshot wounds. Barbee told them that "some dudes got Garland [Brinkley]." The victim was asked if the same men who had taken Garland had shot him, and Barbee responded "yes." He told them that three men in masks had entered the store, fired several shots, and then taken away the owner of the market (Garland Brinkley).

Barbee was taken to Vanderbilt University Hospital, where over the next few days he underwent several surgeries. Fourteen days later, on January 12, 1994, Corey Barbee died of complications from the gunshot wounds to his chest and abdomen.

Garland Brinkley, whose nickname is "G-Man," was the owner of G-Man's Market. About six months earlier, Brinkley was involved in some drug transactions, specifically cocaine, with a man he knew as Harold Moore, but whose name was actually Harold Shaw, the Defendant. Brinkley testified that he and Defendant agreed that Defendant would "front" the cocaine to Brinkley to sell, and then Brinkley would later pay Defendant. The cocaine was actually given to Brinkley by a man named Eric, who Brinkley testified was a "go-between." Brinkley testified that in two such transactions, he gave the drugs to someone else to sell. The proceeds from the drug deals were apparently never given to Brinkley so he in turn never returned any of the proceeds to Defendant. It is not clear from the record as to the total amount and value of the cocaine in the transactions. At the preliminary hearing, Brinkley said he owed $3,800 for three ounces on the first transaction and $9,000 for 12 ounces on the second deal. However, he told investigators and testified at trial that the deals involved a quarter-kilo valued at $27,000.

Brinkley testified that on the morning of December 29, 1993, Defendant telephoned him at the store and demanded that Brinkley turn over his house and his Chevrolet Blazer as payment for the cocaine debt. Defendant claimed that Brinkley owed him $27,000 plus a $5,000 late fee, for a total of $32,000. Later that morning, Defendant came to G-Man's Market and again demanded payment from Brinkley. However, Brinkley refused and Defendant left.

Brinkley testified that later that evening, Corey Barbee, known as "Bruno," was at the store with Brinkley. Barbee and Brinkley had been friends for several years. Barbee would stop by the market and watch television and would sometimes help Brinkley clean the store and close it at night. As they were closing the store on the night of December 29, 1993, the door suddenly flew open and a masked man stepped in and shot Barbee five or six times. Brinkley described the shooter as a black male, about six feet tall and 175 pounds, with a hood over his head in addition to the mask. He was armed with what Brinkley described as a nine millimeter Glock or Beretta. The shooter was followed into the market by two more men. The second man had no mask on his face, but only a hood and sunglasses. Brinkley recognized this man as Harold Moore (Shaw), the Defendant. Defendant was armed with a pistol-grip shotgun. The third man, who was also masked, was shorter and chubbier. According to Brinkley, all three men were black.

After Barbee was shot, Barbee asked to use the phone to call an ambulance. He then managed to get to the phone and call 911 for help. Brinkley testified that the Defendant then ordered Brinkley to leave the market with them. Brinkley said that he initially refused and that the man who had shot Barbee then "shot me and grazed my leg." He testified that the bullet did not enter his leg, but that he has a scar from being grazed. However, there is apparently no medical record of such a graze wound. Brinkley eventually got into the 1976 or 1977 blue Chevrolet Impala with the three men. Barbee was left at the market.

This same evening, Clara Coleman was helping in some remodeling work on a business located in the same building as G-Man's Market. She heard gunshots and looked out in time to see a light blue older model car speed away from the market. She testified that she saw three or four black men in the car. Ms. Coleman did not know Brinkley.

As the car drove off, Defendant told the shooter to put duct tape over Brinkley's face and to bind his hands together with the tape also. Defendant held the shooter's gun while he taped up Brinkley. According to Brinkley, the car ride lasted about 15 to 25 minutes. Defendant kept saying to Brinkley, "you think I'm playing with you?" The car eventually came to a stop and the men pulled Brinkley out and took him into a garage or shed. They bound his feet with duct tape. There the three men proceeded to beat Brinkley. Defendant pistol-whipped him. Brinkley testified that he believes he passed out two or three times during the beatings which he estimated lasted "for hours." Defendant then forced Brinkley to make several cellular phone calls in an effort to have Brinkley's wife bring the deed to their house. Calls were made to Brinkley's mother, aunt, brother-in-law, and a cousin, but they could not locate Brinkley's wife.

Brinkley said that three or four more black men later joined the group and participated in the beatings. Brinkley still had tape over his eyes, but he said he could tell the men were black by their voices. The men took his wallet which had about $300 cash in it. They cut his pants and inflicted a four to five inch laceration on his left thigh. According to Brinkley, his attackers poured some liquid on his wound and attempted several times to light it with a match, although doctors were unable to find any evidence of burns. However, a trauma surgeon who treated Brinkley at Vanderbilt testified that lacerations often produce a burning sensation, particularly if liquid is poured on them.

The beatings continued until someone said "kill him." At this point, most of the men stepped outside to confer, but when they returned Brinkley was told that he was "lucky." They then cut the tape from his ankles, threw him back in the car, and drove to Whites Creek Pike. The car slowed down near the United Parcel Service location and Brinkley was thrown out. He testified that as he rolled down an embankment, he heard two or three shots fired. The car then took off.

Brinkley was able to pull the tape from his eyes enough to see, and he then walked to the UPS security guard station. One guard called 911 while the other cut the tape from Brinkley's face and wrists. An ambulance took Brinkley to Vanderbilt Hospital where he was treated for a fracture to his upper jaw, a large cut on the back of his scalp, a cut on his left thigh, injuries to his mouth, and rib pain suggesting a fractured rib. Brinkley was discharged from Vanderbilt on December 31, 1993.

Investigators found six nine millimeter shell casings, two outside the market and four inside. Brinkley acknowledged that the fully-loaded .357 revolver found on the floor of the market belonged to Barbee, who usually carried it in his coat pocket. Also, a fully-loaded nine millimeter semiautomatic pistol was found under the cash register. Brinkley identified that gun as belonging to him. Officer Brad Corcoran testified that neither of these weapons appeared to have been fired. The only fingerprints identified at the scene were those of Brinkley and Barbee.

On January 12, 1994, the day Corey Barbee died, homicide detectives Johnny Lawrence and Mike Roland interviewed Brinkley. They showed Brinkley a photographic array from which Brinkley identified Defendant as the leader of the group that kidnapped him and killed Barbee.

The day after Brinkley was released from the hospital, Defendant called him and reiterated that he wanted the deed to Brinkley's house. When Brinkley asked why Defendant allowed Barbee to be killed, Defendant replied, "I don't give a f--- about him." Defendant continued to call Brinkley every day and sometimes several times a day. Brinkley finally called the police because of the harassing calls from Defendant. Detectives went to Brinkley's house and recorded two incoming calls

from Defendant.  In those calls, Brinkley and Defendant argued about the shooting of Barbee.  However, Detective Clifford Douglas admitted that police made no attempt to trace the telephone calls, nor was any voice analysis done in an attempt to determine whether the calls were actually made by Defendant.  Defendant continued to call Brinkley until Brinkley was incarcerated for food stamp fraud.

State v. Harold Wayne Shaw, No. 01C01-9707-CR-00259, 1998 WL 731573 at *1-*4 (Tenn. Crim. App. 1998).

The defendant was convicted by a jury of second-degree murder and aggravated kidnapping. Following a sentencing hearing, the trial court found the existence of the following five (5) statutory enhancement factors applicable to both of the defendant's convictions: that the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range, Tenn. Code Ann. § 40-35-114(1); that the defendant was the leader in the commission of the offense, Id. § 40-35-114(2); that the offense involved more than one (1) victim, Id. § 40-35-114(3); that the defendant treated the victim with exceptional cruelty, Id. § 40-35-114(5); and that the defendant had no hesitation about committing a crime when the risk to human life was high.  Id. § 40-35-114(10).  The trial court found that the defendant was a Range II offender, and sentenced the defendant to thirty-five (35) years imprisonment for the second-degree murder and eighteen (18) years imprisonment for the aggravated kidnapping, both sentences to be served consecutively to each other, for a total effective sentence of fifty-three (53) years.[1]

The defendant appealed, and this Court affirmed the conviction, but remanded the case to the trial court for resentencing because (1) the trial court erroneously sentenced the defendant as a Range II, rather than a Range I, offender, (2) the trial court erroneously applied two statutory enhancement factors, and (3) the trial court ordered the defendant to serve consecutive sentences without adequately making the required findings of fact and conclusions of law on the record.[2]

Following remand, the trial court sentenced the defendant as a Range I offender to serve twenty-two (22) years incarceration for second-degree murder, and ten (10) years for aggravated kidnapping.  The court ordered the sentences served consecutively.

---

[1] At the time the defendant was convicted in this case, he had already been sentenced to eight (8) years incarceration for possession of cocaine with intent to deliver.  Following the defendant's conviction for the earlier charge, however, the trial court in that case reversed the conviction for possession with intent, and the state appealed. While that appeal was pending, the defendant was convicted in the present case, and the trial court in this case ordered the sentences served consecutively to each other and to the eight (8) year sentence for the prior charge.  Following the state's appeal from the trial court's dismissal of the previous charge, this Court reinstated that conviction.  Thus, on the defendant's direct appeal in this case, this Court found that ordering the defendant to serve the instant sentences consecutively to the previous sentence for possession with intent was proper.

[2] On direct appeal, the state apparently conceded that the defendant should have been sentenced as a Range I offender.

**Length of Sentence**

A.

First, the defendant contends that the trial court's sentence for second-degree murder was excessive. This Court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). However, this presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 95 (Tenn. 1997). In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; Ashby, 823 S.W.2d at168.

The defendant argues that his sentence of twenty-two (22) years for second-degree murder as a Range I offender was proportionally greater within the sentencing range than his original sentence for thirty-five (35) years as a Range II offender. Twenty-two (22) years constitutes eighty-eight (88) percent of the maximum sentence allowable for a Range I, second-degree murder conviction, and thirty-five (35) years constitutes eighty-seven and one-half (87.5) percent of the maximum allowable sentence for a Range II, persistent offender. Thus, argues the defendant, the trial court's sentence following remand is presumptively vindictive according to North Carolina v. Pearce, 395 U.S. 711, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969).

First, we note that the defendant's reliance on Pearce is misplaced. The purpose of the holding in Pearce was to ensure that the defendant's sentence was not influenced by the trial court's vindictiveness and that the defendant was not deterred from seeking appellate review:

> Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial. And since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.

395 U.S. at 725. In Pearce, the United States Supreme Court held that the state violated a defendant's due process rights where, following a retrial after a successful appeal, the trial court imposed a harsher sentence on the defendant than the sentence originally imposed. Id. at 726. The Court opined that, because the trial court imposed a harsher sentence without offering any justification for the increased sentence, a presumption of the trial court's vindictiveness arose. Id. Here, the trial court, following remand, actually imposed a lesser sentence in terms of absolute years on the defendant, thus, no such presumption arose.

Furthermore, we reject the idea that Pearce or its progeny mandates adherence to a precise mathematical formula when a defendant is resentenced within a lesser sentencing range. Indeed,

such a formula would be almost impossible to administer, because the ranges themselves are of different parameters. For example, the sentencing range for a Range I offender convicted of second-degree murder is between fifteen (15) and twenty-five (25) years. Tenn. Code Ann. § 40-35-112 (a)(1). The sentencing range for a Range II offender convicted of the same crime is between twenty-five (25) and forty (40) years. Id., § 40-35-112 (b)(1). Thus, the sentencing range is wider for a Range II offender (fifteen years) than it is for a Range I offender (ten years).

B.

The defendant also argues that the trial court erroneously enhanced the defendant's sentences following remand. Following the defendant's direct appeal, this Court held that the trial court erred in applying Tenn. Code Ann. § 40-35-114(3), the "more than one victim" factor, to both sentences, and in applying Tenn. Code Ann. § 40-35-114(5), the "exceptional cruelty" factor, to the sentence for second-degree murder. Because there was no new evidence presented at the second sentencing hearing and the trial court was ordered to resentence the defendant without relying on the stricken enhancement factors, the defendant argues that the sentence imposed following remand was excessive.

The defendant was convicted of second-degree murder, a Class A felony, and aggravated kidnapping, a Class B felony. The presumptive sentence for a Class A felony is the midpoint of the applicable range if no mitigating or enhancement factors for sentencing are present. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class B felony is the minimum sentence in the range. Id. If enhancement and mitigating factors do exist, a trial court should start at the presumptive sentence, enhance the sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e).

In this case, the sentencing range for a Range I offender convicted of second-degree murder is between fifteen (15) and twenty-five (25) years. Tenn. Code Ann. § 40-35-112 (a)(1). Because the trial court found enhancement factors applicable, the presumptive sentence was the midpoint of the range, or twenty (20) years. After finding three enhancement factors and no mitigating factors, the court enhanced the sentence to twenty-two (22) years.

The sentencing range for a Range I offender convicted of aggravated kidnapping is between eight (8) and twelve (12) years. Tenn. Code Ann. § 40-35-112 (a)(2). The presumptive sentence was thus eight (8) years, the minimum within the range. The trial court found four (4) applicable enhancement factors and imposed a ten (10) year sentence for aggravated kidnapping.

Both sentences were, under the circumstances, well within the trial court's discretion. Although the defendant argues that the trial court should have reduced the sentence by a greater proportion because fewer enhancement factors were used in resentencing, the defendant cites no authority supporting this position. No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court, provided that its findings are supported by the record. State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995); see also Tenn. Code Ann. § 40-35-210, Sentencing Commission Comments. We find that the record supports the defendant's sentences.

This issue is without merit.

## Consecutive Sentencing

The defendant next asserts that the trial court erred in imposing consecutive, rather than concurrent, sentences. The trial court imposed consecutive sentences because it found that the defendant (1) was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood, and (2) was an offender whose record of criminal activity was extensive. See Tenn. Code Ann. § 40-35-115 (b)(1), (2). Without further comment, the trial court held "with regard to [consecutive sentencing] the court finds under [Tenn. Code Ann. §] 40-35-115 that [subsection] one applies and that [subsection] two applies. I run those sentences consecutive one to the other . . . ." With no apparent findings of fact supporting the trial court's holding, we must review the imposition of consecutive sentences de novo.

We disagree with the trial court's finding that the defendant was a professional criminal. Although the defendant has two prior drug convictions, the record does not support a finding that the defendant was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood. Contrary to the state's assertion, the presentence report indicates that the defendant was gainfully employed since leaving prison in 1993 and has not been convicted of a crime since 1991. Although the defendant's conviction in the present case resulted from a drug debt, we may not assume that the defendant was a professional criminal who devoted his life to criminal acts as a major source of his livelihood. Although the state claims that the evidence at trial proved that the defendant was a "major drug dealer," the only relevant evidence on this point established that the defendant had made two (2) or three (3) drug deals about six (6) months before the shooting. Absent any other specific findings of fact, we may not assume the existence of this factor. Cf. State v. Desirey, 909 S.W.2d 20, 32 (Tenn. Crim. App. 1995)(holding that evidence did not preponderate against trial court finding that defendant was a professional criminal where evidence proved that defendant relied on income from illegal gambling and made large sums of money from his illegal activities); see also State v. Vanek, No. 01C01-9601-CR-00025, 1996 WL 752336 at *3 (Tenn. Crim. App. 1996)(holding that the record did not support finding that defendant was a professional criminal merely because the defendant had sold drugs).

However, we agree with the trial court that the defendant was an offender whose record of criminal activity was extensive. Extensive criminal history alone will support consecutive sentencing. State v. Chrisman, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994). In this case, the defendant had seven (7) convictions prior to the two in the instant case. In short, we agree with trial court that consecutive sentences were appropriate under Tenn. Code Ann. § 40-35-115 (b)(2). See State v. Palmer, 10 S.W.3d 638, 649 (Tenn. Crim. App. 1999).
This issue is without merit.

Accordingly, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE