# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 6, 2004 Session

## STATE OF TENNESSEE v. CARY RAY DAVIS

**Appeal from the Criminal Court for Tipton County**
**No. 4519    Joseph H. Walker, III, Judge**

---

### No. W2003-01202-CCA-R3-CD  - Filed May 19, 2004

---

The Tipton County Grand Jury indicted the defendant for one count of aggravated assault.  After a jury trial, the defendant was found guilty of aggravated assault.  He was sentenced to three years as a Range I Standard Offender.  The trial court ordered the defendant to serve 180 days in incarceration and the balance of the sentence in community corrections.[1]  The defendant argues two issues in his appeal: (1) there was insufficient evidence to convict him of aggravated assault because he was acting in self-defense; and (2) the trial court erred in denying the defendant full probation.  We affirm the actions of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

J. Thomas Caldwell, Ripley, Tennessee, for the appellant, Cary Ray Davis.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; Elizabeth Rice, District Attorney General; and Colin Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]Tennessee Code Annotated section 40-36-106(a)(1)(B) provides that persons convicted of a crime against the person as provided in title 39, chapter 13, parts 1-5 are not generally eligible for community corrections.  Aggravated assault is prohibited by Tennessee Code Annotated section 39-13-102.  Thus, the defendant is not eligible for community corrections unless he meets the special needs exception for persons with chronic substance abuse and/or mental health problems.  See Tenn. Code Ann. § 40-36-106(C).  Nothing in the record indicates that the defendant was placed in community corrections pursuant to the special need exception, however because of the defendant's mental health problems we cannot definitely say he is not eligible for community corrections under this exception.  The State has not raised this issue and we will not address it further herein.  Should the State wish to address this issue it may do so in the trial court where an illegal sentence may be corrected at any time.  See State v. Burkhart, 566 S.W.2d 871, 873 (Tenn. 1978); Cox v. State, 53 S.W.3d 287, 291 (Tenn. Crim. App. 2001).

# OPINION

## FACTUAL BACKGROUND

On April 15, 2002, the victim, Brandon McClain, and the defendant, Cary Ray Long, encountered each other at a three-way stop on Highway 59, near Covington. The victim drove a Ford Ranger extended-cab pick-up truck. The defendant drove a Ford Mustang. The victim's brother, Chad McClain and two female passengers rode with the victim. Tabitha Theriot, who is now Tabitha Davis, the defendant's wife, and was the victim's ex-girlfriend, rode with the defendant.

After passing each other on the highway several times, both the defendant and the victim ended up in the parking lot of a flea market. Both men got out of their vehicles and began to argue. When the defendant saw the victim's brother get out of the truck, the defendant returned to his vehicle and retrieved an aluminum softball bat. After a few more minutes of arguing, both the victim and the defendant considered the argument over. However, when the victim turned to walk back to his car, the defendant hit him in the head with the ball bat, causing serious injuries.

The Tipton County Grand Jury indicted the defendant on November 4, 2002, for one count of aggravated assault. A jury found the defendant guilty as charged on March 17, 2003. At a sentencing hearing held on April 9, 2003, the trial court sentenced the defendant to three years as a Range I Standard Offender and ordered the defendant to pay restitution to the victim in the amount of $4,800. The trial court entered an order the same day transferring the defendant's sentence to the Corrections Management Corporation after service of 180 days in jail.

As noted, the defendant argues two issues in this appeal: (1) Whether the evidence was sufficient to support his conviction; and (2) whether the trial court erred in failing to grant the defendant full probation.

## ANALYSIS

### Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the

burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The State and the defendant both presented several witnesses at trial. The State's first witness was Trooper Steve Max. Trooper Max testified that he was not on duty, but working at his house down the street from the scene of the altercation. He saw two vehicles and a motorcycle pass by, then heard squealing tires. His sister, who was at the house with him, left the house and came back to tell him that there was a boy lying in the highway. Trooper Max and his wife drove to the scene and saw a young man lying in a parking lot two feet from the edge of the road. When he drove up he saw a Mustang, a pick-up truck and several teenagers standing around. Max could tell the young man had a serious injury because he was semi-conscious. Max identified the defendant in the courtroom as being at the scene. Trooper Max also said there was an older gentleman standing over the victim yelling at him, but Trooper Max could not understand what he was saying. A witness told Trooper Max that the victim had been hit by a ball bat, and Trooper Max gave the police that information. However, the police did not locate the ball bat while Max was on the scene.

The State's next witness was the victim's younger brother, Chad McClain. Mr. McClain stated that he knew who the defendant was, but had never actually met him. On the day of the incident, Mr. McClain was riding with his brother, the victim, and their two girlfriends in the victim's pick-up truck. They came to a three-way stop on Highway 59 and encountered the defendant. The defendant "flipped off" the victim. The victim continued on his way then turned behind the defendant to go to a gas station that was down the road. The victim then pulled out of the gas station and drove back toward the three way stop, planning to continue on to his mother's house. They did not see the defendant at the gas station. The next time Mr. McClain saw the defendant, the defendant was three or four cars back and weaving in and out of traffic until he was behind the victim. The defendant then got in front of the victim and cut him off. According to Mr. McClain, both the defendant and the victim, came to a sliding stop in a parking lot. Tabitha Theriot, the victim's ex-girlfriend, was in the defendant's car. The defendant and the victim got out of their vehicles at the same time. The defendant then returned to his car and came back with an aluminum bat. When Mr. McClain saw that the defendant had a bat, he got out of the truck. Mr. McClain said that the defendant accused the victim of "messing with" Tabitha. Then the victim told the defendant that he did not have a problem with the defendant. The defendant stated that if the victim did not have a problem with him, he did not have a problem with the victim. Mr. McClain stated that he then started back toward the truck and looked over his shoulder to see the defendant hitting the victim in the head with the bat. The victim took a half step and turned around immediately before

he was hit. Mr. McClain ran to the victim because he hit the ground as soon as he was hit. Mr. McClain stated that the defendant continued to hold the bat until Tabitha's parents arrived, and they got the bat from him. Mr. McClain testified that Tabitha's father stood over the victim and yelled at him, "you got what you deserved." Mr. McClain said that Trooper Max grabbed Tabitha's father and told him to stand by his truck. Mr. McClain also stated that the defendant was unarmed throughout the altercation and he did not usually carry a weapon of any sort. He also stated that the victim was not trying to chase down the defendant or pick a fight.

The State's next witness was Jenny Boshell. Jenny Boshell was the victim's girlfriend at the time of the incident. They had been dating for four months. On the day of the incident, the victim picked her up at her friend's house. She was riding in the truck with the victim that day to go to his mother's house. She stated that they first went to the store and then turned onto Highway 59 to go to the victim's mother's house. Ms. Boshell said that the victim looked in the rearview mirror and asked if the defendant was behind them. Ms. Boshell looked back and saw the defendant passing cars and catching up with the victim. When the defendant caught up with the victim, he swerved in front of the victim and hit his brakes. They both went into a parking lot. Ms. Boshell testified that the defendant got out of his car and then the victim got out of his car. She said that the defendant then got a ball bat out of his car. When the defendant got the bat, the victim's brother also got out of the truck. Ms. Boshell stated that the defendant and the victim were yelling at each other and the other girl riding in the victim's truck was standing between them trying to get them to stop. Ms. Boshell said that Chad McClain was standing beside the truck on the driver's side. No one in the truck had any weapons. Ms. Boshell did not hear any threats exchanged between the victim and the defendant. At one point she thought the defendant and the victim were finished with their argument and thought the victim was moving back towards the truck. Then Ms. Boshell heard the defendant hit the victim, and it sounded like something hitting a wall. When she heard the sound, she saw the victim fall to the ground and ran over to him. Ms. Boshell also stated that the victim did not have his hands in his pockets and made no sudden movements toward the defendant before being hit.

On cross-examination, the defendant's attorney specifically asked Ms. Boshell about a portion of her statement to the police after the incident. In her statement to the police, Ms. Boshell said that the defendant pulled in front of the them and signaled them to pull over. On cross-examination, she stated that she meant that the defendant pulled in front of them and slammed on his brakes.

The State's next witness was Bobby Gene Malone. Mr. Malone was at his son's house the day of the incident. His son's backyard backed up to the parking lot where the defendant and the victim fought. The witness and his son heard tires "squalling" and three or four seconds later they heard wheels screeching to a stop and "screaming and hollering." Mr. Malone and his son got down to the fence and saw a truck and a car where people were "arguing and cussing." It looked like the truck had pulled around in front of the car. Mr. Malone testified that a boy and a girl got out of the truck and at least one boy got out of the truck. Both the boys were arguing and a girl was standing

between them. Then he saw the boy who got out of the truck go and get a ball bat.[2] According to Mr. Malone, the boy in the car turned to go back to the car and the boy from the truck hit the boy from the car in the right temple with a ball bat. The boy who was hit had no weapons. Mr. Malone also stated the boy with the bat gave it to another boy and told him to hide it. The third boy put the bat behind the seat with some other stuff.

The State's next witness was the victim, Brandon McClain. He stated that the day of the incident he was driving his pick-up truck and his brother and two girls were passengers. He knew of the defendant, but had never spoken with him. He first saw the defendant at the three-way stop on Highway 59. One of the girls identified the defendant as the driver of the car. The defendant then "flipped off" the victim, and the victim "flipped off" the defendant. The victim went to the gas station, and then returned to Highway 59 to go to his mother's house. The victim saw the defendant behind him, "driving like a maniac," weaving in and out of traffic. The defendant caught up to the victim and go in front of him and began slamming on his brakes. The victim yanked the wheel to keep from hitting him and ended up in a parking lot. The victim testified that he was not chasing the defendant in any way and was not looking for any trouble. When they stopped in the parking lot, both the victim and the defendant got out of their vehicles. The victim stated that he did not even know what was going on at first and did not even know that the defendant had a problem with him. He said that Ms. Theriot was an ex-girlfriend, but that he had not kept in touch with her in the year since they had broken up. When they got out of their vehicles, the defendant accused the victim of calling Ms. Theriot. They began to argue. At some point, the victim told the defendant that he did not have a problem with him. The victim felt like they had reached a resolution at that time, and the victim turned to go get in the truck. While he was turning around to go get in the truck, he felt the bat hit his head. He did not have any weapons and made no sudden movements.

The victim testified that he was treated in a hospital. Between his hospital stay and his in-patient therapy, the victim spent four months in some sort of medical care. The victim had to relearn how to walk and talk. At the time of the trial, he was working at the Millington Wal-Mart. Before the incident, he worked at the Sav-A-Lot in Covington. The victim stated that it was "real hard to think" and if he gets nervous, it is hard to talk, and he begins to stutter.

The State's next witness was Officer Robert Tankersley. Officer Tankersley testified that he arrived at the scene and found a white male lying on the ground. The male was moving his mouth, but was unable to talk. Someone at the scene told the officer about the bat, and he found it behind the seat of a pick-up truck. Also testifying at trial was Investigator Scottie Delashmit who had brought the bat to court the day of the trial.

The State's next witness, Beth Ezra, was the manager at the Save-A-Lot and had employed the victim both before and after the incident. The victim began as a stockman and was promoted to assistant produce person on the night shift. The victim came back to the Sav-a-Lot four months after the incident. Ms. Ezra testified that when the victim came back his speech was slow and slurred, and

---

[2]Apparently, Mr. Malone confused the drivers of the vehicles in his testimony.

he would hesitate when answering questions. When he worked for her before the incident, he needed no supervision, but after the incident he needed supervision all the time. The incident really seemed to affect his memory. She could not give him more than two tasks at a time, or he would have to find her or she would have to find him to clarify.

The victim's aunt, Lisa McClain, also testified. She cared for the victim after he came home from his stay at a rehabilitation center following his hospital stay. When he came home, he had to have therapy three days a week and could not be left alone. After the accident, the victim could not communicate or talk at all. He was weak and could not walk without someone helping him. Even at the time of trial, his speech would become slurred or he would forget what he was saying. It was four weeks after the accident before he could speak well enough to say what he wanted to say.

The defendant also presented proof at trial. His first witness was Leroy Johnson. Mr. Johnson knew the defendant, but was not close friends with him. He was riding his bike down Highway 59 the day of the incident when he saw the truck and the car go by him. He said the car was in front and it pulled off to the side of the road. The truck also pulled off to the side of the road. Mr. Johnson testified that he saw everyone get out of the car and the truck. He saw the defendant and the victim arguing. Then, the defendant went back to his car to get a bat. Mr. Johnson said a person other than the victim tried to come around the side of the defendant and stay out of the defendant's view. The driver of the truck was coming toward the victim and made an aggressive move. When he made the aggressive move, the defendant hit the victim with the bat. On cross-examination, Mr. Johnson repeatedly stated that the defendant was acting in self-defense. He also stated that neither of the boys in the truck were armed. At one point during cross-examination, the State asked the victim's brother to stand up. The State then asked Mr. Johnson if the victim's brother was the man who was sneaking around the side of the defendant. Mr. Johnson said he was the man he saw. Mr. Johnson also said the boy who was hit by the bat was not in the courtroom. He also said he was so close to the fight, if there had been blood it would have splattered on him.

The defendant's next witness was Tabitha Davis, the defendant's wife and formerly Tabitha Theriot. She said that she had dated the victim and they had broken up about a month before the incident. She testified that the day of the incident she and the defendant were at her parents' house and the defendant asked her to marry him. The ring did not fit, so they decided to go to Wal-Mart. On the way to Wal-Mart, they saw the victim at the three-way stop on Highway 59. The defendant and Ms. Theriot went to a gas station, and the victim followed them to the gas station. When the defendant saw the victim at the gas station, he jumped right back in the car. The victim followed right behind them and was flashing his blinkers and lights. The victim would come up to the defendant's car as if he was trying to hit it. Then the victim passed the defendant and kept slamming on his brakes so the defendant would run into the back of the truck. The defendant then pulled over into a parking lot. The victim and his brother got out of the truck, then the two girls got out of the truck. The victim's brother went over to the truck like he was looking for something, so the defendant came back to the car and got his bat. The defendant and the victim were arguing. They decided not to fight and both turned to go to their vehicles. Then, the victim said something and

jumped at the defendant. The victim had his left hand in his pocket when he jumped at the defendant. When the victim jumped at him, the defendant hit the victim in the head with the bat.

On cross-examination, Mrs. Davis stated that she did not see the defendant and the victim flip each other off, but did see the victim say something, however she did not know what he said. The defendant asked her who was driving the truck, and she told him it was Brandon. Mrs. Davis said she did not understand why the victim was trying to run them down because she had not seen him for about two months before this. She also said that when they got to the parking lot the defendant just pulled over and that it was not a noisy stop. Mrs. Davis' testimony contradicted that of Mr. Johnson's. She said the victim's brother did not try to sneak around the defendant during the argument and that Mr. Johnson was across the street from the fight.

The defendant also testified at trial. He stated that his father was beaten to death when he was ten years old, and he has been in counseling most of his life since his father died. He had started dating Ms. Theriot at the beginning of February before the incident. He and Ms. Theriot were going to town and encountered the victim when they got to the three-way stop. He heard horns honking and saw the victim lean out of the window and yell at them, but he could not understand what the victim was saying. The defendant kept going toward town and pulled into the gas station. When he got out of his car, he saw the victim pull into the parking lot. The defendant decided to go around the block, and the victim followed them. The victim then began running up to him and slamming on his brakes. The victim got in front of the defendant and began slamming on his brakes. The defendant passed him, then the victim kind of cut him off and the defendant went off the road. Then the defendant pulled off the road to let the victim go ahead, but the victim pulled in behind him. The defendant got out of the car. Then the victim got out of his truck. The defendant also saw the victim's brother get out of the truck. They were just talking and eventually worked things out. The defendant turned to walk back to his truck when he heard the victim say something behind him. When the defendant turned around, he saw the defendant with his left hand in his pocket. The defendant thought that the victim was going to hurt him because the victim jumped at him, so the defendant swung the bat and hit the victim. The defendant had heard from several sources that the victim liked to fight and carried a knife with him. He believed the victim had a knife when the victim lunged at him. He was also scared because the victim's brother was there. The defendant felt like it was a situation of two against one. The defendant also saw the victim's brother going through the back of the defendant's truck as if he was looking for a weapon. However, he did not know if the victim actually had a weapon.

The defendant's final witness was Dorothy Fleming. Ms. Fleming is the defendant's mother. She stated that the defendant's father was killed when the defendant was nine years old. She said that the beating death of his father resulted in a lot of counseling, medication and fear. Ms. Fleming testified that the defendant has been in counseling throughout his life as a result of the death of his father. The defendant lived with his mother up until and even after he married Ms. Theriot. At the time of the trial, he and Ms. Theriot were living with his grandmother. She stated that the defendant was not a violent person. He is very easygoing and quiet with a good heart.

On appeal, the defendant argues that the jury should have found him not guilty because he acted in self-defense. Self-defense requires a reasonable belief that "force is immediately necessary to protect against the other's use or attempted use of unlawful force" and that there was an "imminent danger of death or serious bodily injury" to the defendant. Tenn. Code Ann. § 39-11-611(a). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). Further, it is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App.1993). It was within the jury's purview to reject the self-defense theory. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App.1997). Upon our review of a jury's rejection of a claim of self-defense, "in order to prevail, the [appellant] must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

It is obvious in this case that the jury chose to reject the defendant's claim of self-defense. The testimony concerning the events immediately prior to the defendant's attack on the victim was contradictory. The jury could have decided that the witnesses for the defendant who testified that the victim had his hand in his pocket and jumped at the defendant were being untruthful. Even if the jury believed that the victim had his hand in his pocket and jumped at the victim as testified to by the defendant and his wife, there was no testimony that anyone had seen a knife or any kind of a weapon in the victim's possession. Therefore, the jury also could have concluded that the defendant was not justified in using a bat to hit the unarmed victim. See State v. Marcus Duvalle Hurston, No. W2000-01721-CCA-R3-CD, 2001 WL 912753, at * 3 (Tenn. Crim. App. at Jackson, Aug. 13, 2001). For this reason, we conclude that the evidence was sufficient for the jury to find that the defendant's actions were not consistent with the defense of self-defense.

1. The defendant only challenges the jury's rejection of his self-defense claim. He does not challenge his aggravated assault conviction based on the facts adduced at trial. However, we conclude that there was sufficient evidence for the jury to find the appellant guilty of aggravated assault. This issue is without merit.


## Sentencing


The defendant also challenges his sentence to three years to be served as 180 days in jail and the balance to be served in community corrections. The defendant argues that he is entitled to full probation. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the

sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

In balancing these concerns, a trial court should start at the presumptive sentence, enhance the sentence within the range for existing enhancement factors, and then reduce the sentence within the range for existing mitigating factors. Tenn. Code Ann. § 40-35-210(e). No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

` A defendant "who is an especially *mitigated offender* or *standard offender* convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6)(emphasis added). In choosing among possible sentencing alternatives, the trial court should consider Tennessee Code Annotated section 40-35-103(5), which states, in pertinent part, "The potential or lack of potential for the rehabilitation or treatment of a defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(5); State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App.1994). The trial court may consider a defendant's untruthfulness and lack of candor as they relate to the potential for rehabilitation. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App.1999); see also State v.Bunch, 646 S.W.2d 158, 160-61 (Tenn.1983); State v. Zeolia, 928 S.W.2d 457, 463 (Tenn. Crim. App.1996); State v. Williamson, 919 S.W.2d 69, 84 (Tenn.Crim.App.1995); Dowdy, 894 S.W.2d at 305-06.

The defendant argues that he should have been given full probation. When seeking full probation, the burden rests with the defendant to prove his suitability to that manner of sentence. See Tenn. Code Ann. §40-35-303(b); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1995). "Probation is a privilege or act of grace which may be granted to a defendant who is eligible and worthy of this largesse of law." State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990). In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, including physical and mental condition; the deterrent effect on the defendant; and the likelihood that probation is in the best interests of both the public and the defendant. See Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974); State v. Kendrick, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999).

At the sentencing hearing, the trial court stated the following:

I have reviewed the Presentence Report that's been filed, considered the testimony heard here today, and find that the defendant should be sentenced as a standard offender. I've reviewed the Victim Impact Statement, also.

The Court finds, under T.C.A. 40-35-114, that enhancing factor number 2 applies; that is, the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

The Court finds there are no mitigating factors that apply.

The Court finds it's a proper case to sentence the defendant to the presumptive sentence of three years as a standard offender.

The defendant has been tried on occasions with medication. He's been tried on occasions with anger management classes. The Court is also very concerned about the defendant's behavior, not only in this particular case, but apparently his past history that's made evident by the Presentence Report, that the court was unaware of at the time of trial.

The Court's opinion of the facts of this particular case was that the defendant was much agitated and instigated by someone. I've got my suspicions about exactly who had been doing that to him. But, in any event, the defendant acted in a very unacceptable way, and the results were tragic to the victim in this particular case.

The Court finds that this is a case where the defendant deserves incarceration.

He qualifies, under T.C.A. 40-35-303, for probation, and under T.C.A. 40-35-106, for alternate sentencing.

The Court finds that the defendant has a history of criminal conduct, to avoid deprecating the seriousness of this offense, and that other measures have been used in the past with regard to the defendant, violent behavior, including while he was an adult and a juvenile, with no success, that incarceration is proper.

As evidenced by the trial court's above-quoted findings of fact and ruling, the trial court considered all the factors required when determining whether to grant full probation. Testimony at the sentencing hearing and the contents of the Presentencing Report showed that the defendant was convicted of domestic assault shortly after the trial in this case ended, and he also had prior adult convictions involving bad checks and reckless driving. He has additional juvenile adjudications for domestic assault, misdemeanor theft, and traffic violations. The defendant has received mental health treatment since the age of nine, and he takes the anti-psychotic medication "Zyprexa." The defendant himself stated that the medication keeps him from getting mad and depressed, but because it makes him sleepy, he does not always take it as directed. He also admitted that he was involved in a domestic assault with his mother-in-law before the incident with the victim and a domestic assault with his father-in-law shortly after the incident with the victim. There was also evidence of a domestic assault against his wife. He committed assault on his mother while a juvenile and was ordered to attend anger management courses, but they "didn't seem to help much."

Clearly, it would not be in the best interest of either the defendant or the community to grant him full probation. As the trial court stated, the defendant is on medication and has had anger

management courses, but as evidenced by his assaults on his wife and her family, they have clearly had no effect. It is possible that some time in incarceration will demonstrate to the defendant what a serious concern his violent tendencies are to both his family and the community as a whole.

The trial court followed the sentencing principles in its determination of the defendant's sentence. Therefore, the defendant has not overcome the presumption of correctness in regard to the defendant's sentence. We conclude that the evidence presented at the sentencing hearing supports the trial courts denial of full probation for defendant, as well as the three year sentence with 180 days to be served in incarceration and the balance to be served through community corrections.

## CONCLUSION

For the reasons stated above, we affirm the defendant's conviction for aggravated assault and his sentence.

_____

_____      _____
                                                                     JERRY L. SMITH, JUDGE