IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 12, 2006 Session

## STATE OF TENNESSEE v. DELSHAUN EPPS

**Appeal from the Criminal Court for Shelby County**
**No. 04-02523   James C. Beasley, Jr., Judge**

---

**No. W2005-02487-CCA-R3-CD  - May 18, 2007**

---

The appellant, Delshaun Epps, was indicted for especially aggravated robbery and felony murder. After a jury trial, the appellant was convicted of especially aggravated robbery and reckless homicide. The appellant was subsequently sentenced to twenty-four years for the robbery conviction and four years on the homicide conviction. The trial court ordered the appellant to serve the sentences consecutively, for a total effective sentence of twenty-eight years. After the denial of a motion for new trial, the appellant pursued this appeal. On appeal, the appellant challenges the sufficiency of the evidence and his sentence. For the following reasons, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant Delshaun Epps.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Theresa McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On June 29, 2003, Officer Antwon Tucker of the Memphis Police Department responded to a 911 call from a woman who reported that her neighbor's side storm door was open. The caller reported that it was not the homeowner's habit to leave his door opened or unlocked. The home was located at 2161 Charjean. Officer Tucker arrived on the scene with his partner and entered the residence through the open side storm door in the carport. As they entered the residence, they discovered that the home had been ransacked. Officer Tucker noted that the front door appeared to

have been forced open. Upon further inspection of the residence, Officer Tucker and his partner found the victim and homeowner, Gregory Smith, lying deceased on the kitchen floor. According to Officer Tucker, the victim appeared badly beaten and had duct tape around the top of his head and a white cloth tied around his neck.

Bonita Black, the victim's girlfriend, arrived at the scene later that evening. Ms. Black informed Officer Tucker that she lived at the residence "off and on." Ms. Black also informed Officer Tucker that she got mad at the victim the previous morning when he informed her that two females were coming to the house on the evening of June 28. Ms. Black stated to the officers that she came to the house on the morning of June 29 to retrieve some clothes, but left when she knocked on the door and got no response from the victim.

The appellant was later arrested for his participation in the robbery and murder of the victim. After the appellant waived his rights, Lieutenant Nathan Berryman interviewed the appellant to ascertain his role in the robbery and murder of the victim. During his statement, the appellant admitted to participating in the robbery of the victim along with individuals named Latisha Jones, also known as Pumpkin, as well as individuals named James Thacker and "Kim."

According to the appellant, the four individuals met at the corner near his apartment and walked to the store while planning the robbery. The initial plan was for Kim to go up to the house and pretend to be talking on the phone. Kim was to "call [the rest of the individuals] from the side and tell [them] to come on in the house, screaming really loud, like something had happened to her kids to distract him." Apparently, they arrived at the house and Kim entered, then the rest of the individuals just walked into the house. When the appellant walked in, he told the victim to "get down," then Pumpkin hit him with a bottle on his way down to the floor. The appellant explained that he grabbed two t-shirts and a pillowcase and tied the victim's hands and legs and put the pillowcase over the victim's feet.

The victim asked the appellant if they were going to kill him. The appellant then took the victim to the "back room" where he laid the victim on the bed and threw a blanket over him. The victim told the appellant that they could take everything and even informed the appellant that he had $4,000 in the house and was going to show the robbers the location of the money. At that point, the appellant grabbed the television, left the house and took the television behind the carport. James and Kim informed the appellant that the victim got loose, so they had to "tie him back up." When the appellant returned to the house, the victim was "right behind the door [to the back room] blocking it so I couldn't get back in." When the appellant finally got back into the room, James and Pumpkin were "rolling the cord around" the victim when the blanket fell off the victim's face. The appellant stated that the victim's face "was so swollen like somebody had beaten him really - - real bad or something." At that point, the appellant grabbed another television and informed the other individuals that he was leaving because that "wasn't [him]."

The appellant "figured that James and Pumpkin was [sic] in there torturing the guy to find out where the $4,000 was while I was still in there trying to get the other stuff out of the house."

When the appellant left the house, he noticed a police car and a "dude" standing behind the carport who asked him where he got the items from. The appellant ran to the house to inform the others that they had been discovered. The appellant then ran toward a nearby school and got halfway there before he realized that he left two rifles at the house. The appellant and James ran back to get the rifles and they heard something go "boom, boom in the back room" so they took off. The appellant stated it "sounded like the guy [victim] was back there beating on the door like he was trying to close himself in so if we came back or something."

The appellant told Lieutenant Berryman that he saw Pumpkin hit the victim with a beer bottle during the robbery. Further, the appellant stated that he did not use duct tape to tie the victim up. The appellant admitted that he "meant to tie [the victim] up with duct tape" but that he left his duct tape at the house. The appellant also admitted that he had a pistol in his waistband when he ordered the victim to the ground.

At the conclusion of the statement, the appellant apologized for the victim's death and stated that the victim was alive when they left the house.

The appellant was indicted in April of 2004 by the Shelby County Grand Jury for the especially aggravated robbery and felony murder of the victim. At trial, Dr. Karen Chancellor of the Shelby County Medical Examiner's Officer testified that the victim died from multiple blunt force trauma to the head, chest and extremities inflicted by a blunt object. Dr. Chancellor noted that practically all of the victim's ribs, on both sides of the body had been broken during the beating. A hammer was found at the scene of the homicide.

At the conclusion of the proof, the jury found the appellant guilty of especially aggravated robbery and reckless homicide. At a subsequent sentencing hearing, the trial court sentenced the appellant to twenty-four years for the robbery conviction and four years on the homicide conviction. The trial court ordered the appellant to serve the sentences consecutively, for a total effective sentence of twenty-eight years.

On appeal, the appellant argues that the evidence was insufficient to support his convictions and that the trial court improperly applied enhancement factors to his sentence.

Analysis
Sufficiency of the Evidence

The appellant contends that the evidence was insufficient to convict him of reckless homicide and especially aggravated robbery. Specifically, the appellant argues that the record "contains absolutely no proof that the conduct of the defendant or any other party led to the death of the victim" and that "there is no evidence that there was any deadly weapon used in the commission of the offense."

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Moreover, questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are to be resolved by the trier of fact. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1991).

## A. Criminal Responsibility for Reckless Homicide

Reckless homicide is defined as a "reckless killing of another." Tenn. Code Ann. § 39-13-215(a).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31).

The appellant was convicted of reckless homicide under a theory of criminal responsibility for the conduct of another. "[C]riminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offenses . . . based upon the conduct of another." State v. Lemacks, 966 S.W.2d 166, 170 (Tenn. 1999). "A person is criminally responsible for an offense committed by the conduct of another if [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the

offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2).

Furthermore, under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible. See id. To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

The appellant argues that there was no proof that anyone in his group was responsible for the victim's death, much less that he was criminally responsible for the victim's death. The proof at trial, however, indicated that the appellant witnessed Ms. Jones strike the victim with a beer bottle and participated in tying the victim up and transporting him to the back room of the house. The appellant admitted that he took several items from the house, including guns and televisions. The appellant also told police that during the commission of the robbery, a pillowcase came off of the victim's face and the appellant "saw that [the victim's] face was so swollen like somebody had beaten him really - really bad or something." The appellant even told police that he "figured James and Pumpkin was [sic] in there torturing the guy to find out where the $4,000 was while I was still in there trying to get the other stuff out of the house." The appellant did nothing to inquire about the victim's well-being and actually opined that he thought the victim was being tortured during the robbery. From the evidence, as presented to the jury, we determine that the jury could have inferred that the victim died as a result of being beaten by the other members of the group while the appellant was busy removing items from the house, in what could be described as a "gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. § 39-11-106(a)(31). The appellant saw that the victim was beaten "really" bad, clearly creating a "substantial and unjustifiable risk that death would occur." See State v. Samuel L. Giddens, No. M2005-00691-CCA-R3-CD, 2006 WL 618312, at *9 (Tenn. Crim. App., at Nashville, Mar. 13, 2006), perm. app. denied, (Tenn. June 26, 2006) (holding defendant criminally responsible for victim's death where co-defendant inflicted fatal wounds).

### B. Especially Aggravated Robbery

Especially aggravated robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear· . . . (1) Accomplished with a deadly weapon; and (2) Where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-401, -403(a)(1)-(2) (2003). "'Serious bodily injury' means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. 39-11-106(a)(34). "Deadly weapon" means

-5-

"[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury." Tenn. Code Ann. § 39-11-106(a)(5).

In his statement, the appellant admitted that he had a pistol in the waistband of his pants at the time of the robbery even though the appellant denied using the gun. Additionally, the appellant admitted witnessing Ms. Jones hit the victim with a beer bottle. This Court has repeatedly held that a beer bottle used as a club qualifies as a deadly weapon. See State v. Jimmy Wayne Dudley, No. W2001-01381-CCA-R3-CD, 2003 WL 21339161, at *3 (Tenn. Crim. App., at Jackson, May 16, 2003); State v. Tony Maybry, No. W1999-01438-CCA-R3-CD, 2000 WL 33288754, at *2 (Tenn. Crim. App., at Jackson, June 28, 2000); State v. Albert King, No. 01C01-9301-CC-00042, 1993 WL 539139, at *2 (Tenn. Crim. App., at Nashville, Dec. 30, 1993). Moreover, there was also proof that a hammer was found at the scene, and the testimony of the medical examiner indicated that nearly all of the victim's ribs were broken by the use of some blunt object. Given all the proof, the jury could have easily inferred that a deadly weapon or weapons was used during the commission of the crime. This issue is without merit.

Sentencing

Next, the appellant challenges his sentence. Specifically, the appellant argues that "the trial court erroneously enhanced his sentence based upon factors which were not supported by the evidence and which were elements of the charged offense." The State disagrees.

"When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169. In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). In balancing these concerns, a trial court should place on the record, either

orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing. Tenn. Code Ann. § 40-35-210(e).[1] No particular weight for each factor is prescribed by the statute. See State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995). The weight given to each factor is left to the discretion of the trial court as long as it comports with the sentencing principles and purposes of our code and as long as its findings are supported by the record. Id.

Turning more specifically to the facts of this case, the appellant was convicted of reckless homicide, a class D felony, and especially aggravated robbery, a class A felony. Tenn. Code Ann. § 39-13-215, -403. For felonies, the starting point for sentencing determinations is the minimum of the range. See Tenn. Code Ann. § 40-35-210(c).[2] Undisputably, the appellant was a Range I standard offender; thus, for reckless homicide, two years was the minimum sentence and four years was the maximum sentence against which the trial court was to balance any mitigating and enhancement factors. Tenn. Code Ann. § 40-35-112(a)(4). For especially aggravated robbery, the minimum sentence was fifteen years and the maximum sentence was twenty-five years against which the trial court was to balance any mitigating and enhancement factors. Tenn. Code Ann. § 40-35-112(a)(1).

After an extensive on the record discussion of the purposes of the sentencing act and the guidelines that the trial court is instructed to follow by statute, the trial court determined that the appellant was a range one offender and concluded that due to a prior conviction for domestic assault in 2003, the appellant had a history of previous criminal convictions. Tenn. Code Ann. § 40-35-114(1). The trial court also determined pursuant to Tennessee Code Annotated section 40-35-114(2) that the appellant was a leader in the commission of the offense. The trial court made this determination based on the statements made by the appellant at the sentencing hearing. Specifically, the trial court relied on the appellant's statements in which he indicated that Ms. Jones was the person who initially set up the criminal activity, but that the appellant was the one who recruited Mr. Thacker. The appellant also mentioned that he forgot his duct tape and participated in tying and restraining the victim. Further, the trial court noted that the appellant was the "lead participant" in

---

[1]We note that the Tennessee Supreme Court has determined that despite the ability of trial judges to set sentences above the presumptive sentence based on the finding of enhancement factors neither found by a jury or admitted by a defendant, Tennessee's sentencing structure does not violate the Sixth Amendment and does not conflict with the holdings of Blakely v. Washington, 542 U.S. 296 (2004), United States v. Booker, 543 U.S. 220 (2005), or United States v. FanFan, the case consolidated with Booker, because "the Reform Act [of Tennessee] authorizes a discretionary, non-mandatory sentencing procedure and requires trial judges to consider the principles of sentencing and to engage in a qualitative analysis of enhancement and mitigating factors . . . all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature." State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005). Effective July 1, 2005, prior to the appellant's sentencing hearing herein, the Tennessee General Assembly amended the sentencing act to reflect the advisory nature of enhancement factors.

[2]The Tennessee General Assembly amended this statute effective July 1, 2005, to reflect that the presumptive sentence is the minimum sentence in the range, regardless of the class of the felony. Because the appellant in the case herein was sentenced after July 1, 2005, the amended statute applies.

removing the property from the residence. The trial court next determined that the appellant allowed the victim to be treated with exceptional cruelty. Tenn. Code Ann. § 40-35-114(5). In finding this enhancement factor, the trial court specifically noted the testimony of the medical examiner who determined that "that the victim in this case died as a result of every one of his ribs being fractured." The trial court also noted that the victim had bruising and injuries from head to toe, consistent with being hit by a hammer and that the victim was bound and taped. The trial court compared the victim's injuries to "torture." Lastly, the trial court determined that the appellant possessed a firearm during the commission of the offense.[3] Tenn. Code Ann. § 40-35-114(9). The trial court found the existence of several other enhancement factors, but did not apply them, concluding that they were elements of the offenses. Further, the trial court allowed mitigation for the appellant's efforts at self-improvement, specifically anger management classes, while in jail.

After a review of the record, we determine that the proof supports the trial court's application of the preceding enhancement factors. The appellant did not deny his prior assault conviction. The appellant admitted during his statement that he robbed the victim by taking numerous items from his home. The appellant also admitted that he possessed a firearm during the commission of the offense and that he witnessed Ms. Jones hit the victim with a beer bottle. The medical examiner testified that the appellant died from repeated blunt force trauma inflicted by a blunt object. A hammer was found at the scene of the offense. The appellant also told police that he recruited Mr. Thacker to assist in the robbery. This Court has upheld the application of enhancement factor (2) where a defendant recruited help in committing a crime. See State v. Montes Waters, No. E2001-00882-CCA-R3-CD, 2003 WL 824278, at *9-10 (Tenn. Crim. App., at Knoxville, Mar. 6, 2003), perm. app. denied, (Tenn. July 21, 2003). The appellant admitted that he tied the victim up and took him to the back room of the home during the robbery. The appellant also admitted that he witnessed the appellant's injuries and that it looked as though the appellant had been "tortured." Although the trial court chose to consider in mitigation that the appellant had made efforts at self-improvement during jail, the judge gave the mitigation little weight overall. The trial court was not required to consider the appellant's participation in these programs in mitigation. See Tenn. Code Ann. § 40-35-113. "The weight afforded mitigating or enhancement factors derives from balancing relative degrees of culpability within the totality of the circumstances . . . . In other words, the weight that is given to any existing factors is left to the trial court's discretion so long as . . . its findings are supported by the record." State v. Marshall, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). The trial court's sentencing determination is supported by the record. This issue is without merit.

### Consecutive Sentencing

Lastly, the appellant argues that the trial court erred in ordering him to serve his sentence for reckless homicide consecutively to his sentence for especially aggravated robbery. Specifically, the appellant argues that it was "not the evidence at trial, but the trial court's own assessment of the facts

---

[3]The trial court did not apply this enhancement factor to the appellant's robbery conviction as it correctly found the possession of a deadly weapon to be an element of the offense.

which guided the decision to run appellant's sentences consecutively." The State argues that the trial court properly ordered the sentences to run consecutively.

Under Tennessee Code Annotated section 40-35-115(a), if a defendant is convicted of more than one (1) offense, the trial court shall order the sentence to run either consecutively or concurrently. The trial court may order the sentences to run consecutively if the trial court finds by a preponderance of the evidence that certain criteria enumerated in Tennessee Code Annotated section 40-35-115(b) are present. Those factors include the following:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> (2) The defendant is an offender whose record of criminal activity is extensive;
> (3) The defendant is a dangerous mentally abnormal person . . . ;
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor . . . ;
> (6) The defendant is sentenced for an offense committed while on probation; or
> (7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). The decision to impose concurrent or consecutive sentences, however, is a matter entrusted to the sound discretion of the trial court. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997).

In the case herein the trial court determined that consecutive sentencing was warranted, determining that the appellant was a dangerous offender. The trial court found the circumstances surrounding the commission of the offense to be aggravated and the appellant's decision to commit such a heinous crime indicate an unwillingness to "lead a productive life." The trial court further determined that "the length of the sentence reasonably relates to the offense for which the defendant stands convicted." The trial court concluded that:

> An extended sentence in this case in my opinion is necessary to protect the public against further criminal conduct by the defendant and that consecutive sentences must reasonably relate to the severity of the offense committed, and I find that that's the case here, and that [the appellant], I do find is an offender who is dangerous, and as a result, the Court will impose a consecutive sentencing, and will so order.

Thus, the trial court relied on section (4) of Tennessee Code Annotated section 40-35-115 to justify the imposition of consecutive sentencing. If the trial court rests its determination of consecutive sentencing on this category, the court must make two additional findings. State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence

is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" Imfeld, 70 S.W.3d at 708 (quoting Tenn. Code Ann. §§ 40-35-102(1) and -103(2)); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

We agree with the trial court's decision ordering that these sentences be served consecutively. The record amply supports a finding that the appellant was a dangerous offender. The trial court found that the circumstances surrounding the commission of appellant's offenses were extremely aggravated. The victim was unarmed and in no position to resist the robbery, nor did he attempt to do so. Nonetheless, the victim was severely and ruthlessly beaten causing substantial injuries which resulted in death. Although the appellant stated that the victim was alive when he and the other perpetrators left the residence, the circumstances surrounding the offense do not preponderate against the trial court's finding that the appellant's behavior indicated little regard for human life and that he had no hesitancy about committing a crime where the risk to human life was high. Based on the severity of the injuries suffered by the victim during the offense, the trial court found that consecutive sentencing was necessary to protect society and was reasonably related to the severity of the offenses. We conclude that the trial court did not err in classifying the appellant as a dangerous offender and ordering the appellant to serve his sentences for reckless homicide and especially aggravated robbery consecutively. Consequently, this issue is without merit.

Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE